1

2                    UNITED STATES DISTRICT COURT
                           DISTRICT OF KANSAS
3
UNITED STATES OF AMERICA,          Docket No. 22-20027-DDC
4
   Plaintiff,                      Kansas City, Kansas
5                                  Date: 12/21/2022
     v.
6
AUSTIN SPRUELL-USSERY,
7
   Defendant.
8  ...................

9                         TRANSCRIPT OF
                        DETENTION HEARING
10            BEFORE THE HONORABLE ANGEL D MITCHELL,
               UNITED STATES MAGISTRATE JUDGE.
11
   APPEARANCES:
12
   For the Plaintiff:      Michelle McFarlane
13                         Asst US Attorney
                           360 US Courthouse
14                         500 State Avenue
                           Kansas City, KS  66101
15
   For the Defendant:      Che Ramsey
16                         Asst Federal Public Defender
                           201 US Courthouse
17                         500 State Avenue
                           Kansas City, KS  66101
18
   Court Reporter:         Nancy Moroney Wiss, CSR, RMR, FCRR
19                         Official Court Reporter
                           558 US Courthouse
20                         500 State Avenue
                           Kansas City, KS  66101
21
   Proceedings recorded by machine shorthand, transcript
22 produced by computer-aided transcription.

23

24

25

1                            I N D E X

2
        Argument by Ms. McFarlane                           24
3       Argument by Ms. Ramsey                               27
        Court's Decision                                     32
4

5       Government's Witness:                               Page

6       JAKE BLACKMAN
          DIRECT EXAMINATION BY MS. MC FARLANE               5
7         CROSS EXAMINATION BY MS. RAMSEY                   15

8

9

10                       E X H I B I T S

11      Government's

12        Exhibits              Offered           Received

13
                 1                 14                 14
14               2                 14                 14
                 3                 14                 14
15               4                 14                 14
                 5                 14                 14
16               6                 14                 14
                 7                 14                 14
17               8                 14                 14

18

19

20

21

22

23

24

25

1          THE COURT:  Good afternoon, everyone.  We're here

2    today in Case Number 22-20027, the United States of America

3    versus Austin Spruell-Ussery.  Is that how you say your name,

4    sir?

5          THE DEFENDANT:  Ussery.

6          THE COURT:  I'm sorry?

7          THE DEFENDANT:  Spruell-Ussery.

8          THE COURT:  Spruell-Ussery, okay.  Thank you.  We are

9    here today for a detention hearing.  Will counsel please state

10   their appearances for the record beginning with counsel for the

11   government?

12         MS. MC FARLANE:  May it please the court, Michelle

13   McFarlane appearing on behalf of the United States.

14         THE COURT:  Great, and for the defendant?

15         MS. RAMSEY:  Che Ramsey on behalf of Austin

16   Spruell-Ussery who appears in person with counsel.

17         THE COURT:  Well, as I say, we're here today for a

18   detention hearing.  Miss McFarlane, before we get started, let

19   me just ask, is the government still seeking detention in this

20   case?

21         MS. MC FARLANE:  Yes, Your Honor.

22         THE COURT:  And Miss Ramsey, does the defendant wish

23   to contest the issue of detention?

24         MS. RAMSEY:  Yes, Your Honor.

25         THE COURT:  Then Miss McFarlane, please start by

1   letting me know what the grounds for this detention hearing

2   are, beginning with what grounds the government is invoking

3   under 3142 F 1, 2, as well as any rebuttable presumptions that

4   the government contends apply under 3142 E.

5          MS. MC FARLANE:  Your Honor, I don't believe there are

6   any rebuttable presumptions that apply in this case, but we are

7   seeking detention based upon the risk of flight, risk of

8   non-appearance and danger to the community under 18 USC 3142 F

9   1, because this is an F 1 E, an offense that involves a

10  firearm.

11         THE COURT:  Okay.  And you said the government

12  maintains that both the risk of harm to the community as well

13  as risk of non-appearance, or one or the other, which?

14         MS. MC FARLANE:  Both, Your Honor.

15         THE COURT:  Okay.  All right.  Okay.  With that, Miss

16  McFarlane, how would you like to proceed?

17         MS. MC FARLANE:  Your Honor, just as a preliminary

18  matter, I would proffer the pretrial services report, including

19  the Part B which is a separate document detailing the

20  defendant's criminal history, and I would ask the court to take

21  judicial notice of the bond report as well as the indictment in

22  this case.

23         THE COURT:  Okay.  Very well.  Anything further?

24         MS. MC FARLANE:  Yes, Your Honor, I would also call

25  Detective Jake Blackman to testify.

1          THE COURT:  Okay.  Very good.  I'm sorry, what's the

2     last name?

3          MS. MC FARLANE:  Blackman.

4          THE COURT:  Blackman.  Okay.  If you would please

5     pause so that the courtroom deputy can administer the oath.

6        (Witness sworn.)

7          THE WITNESS:  I do.

8          MS. TILDES:  You may be seated.

9          THE COURT:  Please proceed, Miss McFarlane, whenever

10     you're ready.

11                        JAKE BLACKMAN,

12     Called as a witness on behalf of the government, having been

13     first duly sworn, testified as follows:

14                      DIRECT EXAMINATION

15     BY MS. MC FARLANE:

16     Q.  How are you employed?

17     A.  I'm a detective with the Kansas City, Kansas Police

18     Department, currently assigned to the Bureau of Alcohol,

19     Tobacco & Firearms as a full-time task force officer.

20     Q.  How long have you been a task force officer through the

21     ATF?

22     A.  2018.

23     Q.  And how long have you been a detective with the Kansas

24     City, Kansas Police Department?

25     A.  Since 2016.

1    Q.   And prior to that, were you a patrol officer or something

2    else with the Kansas City, Kansas Police Department?

3    A.   I was.

4    Q.   So how long have you been in law enforcement total?

5    A.   12 years.

6    Q.   As part of your 12 years of experience both with KCKPD and

7    with ATF, have you worked firearms cases?

8    A.   I have.

9    Q.   And is that your primary responsibility as a task force

10   officer with the ATF, that is, the investigation and assisting

11   in the prosecution of firearm cases?

12   A.   That's correct.

13   Q.   And through that, have you been able to gather training and

14   experience with respect to identifying firearms, and knowing

15   how to utilize firearms, and also understanding how individuals

16   in the community who possess firearms use those firearms in

17   furtherance of criminal activity?

18   A.   That's correct, yes.

19   Q.   Okay.  As part of your duties as a task force officer with

20   ATF, were you -- or did you become involved with an

21   investigation involving the defendant who sits here today,

22   Austin Spruell-Ussery?

23   A.   I did.

24   Q.   And can you talk about the -- specifically what happened on

25   that investigation with respect to that investigation on

1   April 11th of this year?

2   A.  I can.  On April 11th, 2022, Mr. Spruell had an active

3   warrant for an aggravated battery and aggravated kidnapping.

4   It was a Wyandotte County state warrant.  The United States

5   Marshal Service had adopted the warrant, meaning they were

6   actively seeking to arrest Mr. Spruell on that particular day.

7   They identified a house located at 2337 South Ninth Street in

8   Kansas City Kansas, and believed that Spruell was inside the

9   house.  Members of the marshal service set up surveillance, as

10  well as being assisted by agents and task force officers of the

11  ATF.  At one point, Mr. Spruell was observed coming out of the

12  house.  He was kind of walking around in the front grass area.

13  Members of the marshal service made the decision to try to

14  arrest Spruell.  When they moved in, Spruell fled inside the

15  residence.  The marshals surrounded the residence, began trying

16  to call him out.  After several minutes, an individual exited,

17  not Spruell, dressed in a -- a red hoodie, which is what

18  Spruell was observed wearing when he ran into the house.  That

19  individual told members of the marshal service that Spruell had

20  -- was armed with a firearm, had told him to wear his hoodie

21  and walk out of the house, to say he wasn't in there.  At that

22  point, a barricade was called, because he was suspected of

23  having a firearm.  Members of the KCK SWAT team were paged to

24  come out to work the barricade.  I began a search warrant for

25  Mr. Spruell's body at that time, and then while I was doing

1    that, Spruell fled from -- it would have been the south side of

2    the residence, ran on foot to a neighbor's house, had scaled up

3    the side of the -- either a garage or building to the top of

4    the roof, and eventually, was able to be talked down by members

5    of the law enforcement.  He was taken into custody.

6    Q.   How many law enforcement officers -- you mentioned

7    marshals, ATF, as well as some others, I think.  How many law

8    enforcement officers were present during this incident?

9    A.   I'd say between 10 to 15.  When SWAT got there, that would

10   have probably put it to over 20.

11   Q.   Okay.  And how long approximately was everything you've

12   described so far, how long did that take?

13   A.   I would say over an hour, nothing more than two hours.  I

14   would say between one to two hours.

15   Q.   Okay.  And you mentioned that you were busy working on a

16   search warrant for Mr. Spruell's body.  Do you -- were you

17   doing a search warrant for the house to search for his person?

18   A.   It was actually for both.  Initially, it was for his body,

19   because he had an active warrant.  I also wrote a search

20   warrant for the residence as well after he came out and was

21   arrested.

22   Q.   Okay.  And you said -- you were saying that he climbed up

23   or somehow got onto the roof of a house?

24   A.   Correct.

25   Q.   And was that the house that he was previously in?

1    A.   It's a house to the south.

2    Q.   House to the south; okay.

3    A.   Uh-huh.

4    Q.   Prior to him exiting the house that he had been barricaded

5    in, were law enforcement like knocking on the door and

6    attempting to call him out of the house?

7    A.   I'm not sure if the marshals actually walked up in front of

8    the door.  I know they had surrounded the house.  They were

9    yelling for him to come out while he was inside the house.  I

10   don't know if they actually walked up and banged on the door.

11   I was gone at that point.

12   Q.   Okay.  But prior to you leaving, they were making -- law

13   enforcement was making a presence known?

14   A.   Yes.  Yes.

15   Q.   Okay.  And you mentioned that there was an individual who

16   exited the house in a sweatshirt that Spruell was previously

17   seen just prior to entering the house or earlier that morning?

18   A.   When he was outside and observed as the marshals moved in,

19   he ran into the house, he was wearing a red hoodie.  An

20   individual came out wearing a red hoodie, believed to be the

21   same hoodie that Spruell had on when he ran from the house in

22   the front yard.

23   Q.   Once he got on top of the roof of the house to the south,

24   what happened after that?

25   A.   He was eventually -- police surrounded the house, he came

1  down, he was taken into custody.

2  Q.  How long was he on the roof?

3  A.  I think probably not more than five, ten minutes at the

4  most.

5  Q.  What was -- once he got down from the roof and was being

6  taken into custody, what was his demeanor like?

7  A.  He was yelling.  I know he said -- according to the marshal

8  service reports that I read, he was yelling Southdale as he was

9  walking back from the roof in custody.

10  Q.  What does Southdale mean to you, if anything?

11  A.  It's a -- it's a known street gang in KCK.  It's been

12  around for a number of years.

13  Q.  Okay.  After Mr. Spruell was taken into custody, did you or

14  other members of law enforcement ever seize a firearm that was

15  associated with Mr. Spruell?

16  A.  We did.

17  Q.  And where was that located?

18  A.  It was located in a back -- if you can picture walking in

19  the front door of a residence, going all the way to the back,

20  there was a small room.  There was a small closet back into the

21  left, and it was wrapped in a shirt.  It was a Glock 22, Model

22  22, 40-caliber pistol.

23  Q.  And were you -- how was that firearm -- how did you make

24  the connection of that firearm to Mr. Spruell initially?

25  A.  Initially, we were told from another person in the house

1    that he was armed with a pistol, and had wrapped it in a

2    t-shirt.  There was also some search warrants done on cellular

3    phones where the same pistol was -- the firearm that looked

4    similar to that was in some cell phone search warrants, and

5    then later, there was a DNA search warrant applied for, secured

6    and served on Mr. Spruell, and the DNA on the slide of that

7    firearm matched Spruell's buccal swab.

8    Q.  So that Glock that was located in the house Mr. Spruell was

9    barricaded in, the DNA on that Glock matched Mr. Spruell's

10   known DNA?

11   A.  That's correct.

12   Q.  So after all of this was taking place on April 11th, 2022,

13   and he was taken into custody on that warrant out of KCK, was

14   he later released from that case?

15   A.  He was.

16   Q.  And do you know approximately when he was released?

17   A.  I don't know when.  I'm not even sure how he bonded out.

18   If it was a posted bond, I would assume it was a surety bond,

19   but at some point, he was released on bond.

20   Q.  At some point, did -- did Spruell's name come up after --

21   after he would have bonded out in connection with another

22   investigation that you were investigating?

23   A.  Yes.

24   Q.  And can you describe how his name came up, and what the

25   circumstances were?

1    A.   Umm, we initiated a case at 875 Ruby Avenue with the target

2    of Ernest Lucas.  We put an elevated camera, a surveillance

3    camera up on that residence.  That was put up May the 11th, I

4    believe.  On June the 6th, while observing video, we observed

5    Austin Spruell, and this was historically viewed.  I don't

6    believe I watched this live, but it was historically viewed,

7    where Spruell showed up in a red Kia with another young lady.

8    He exited the driver's side of it at some point.  He was

9    observed with a long black what appeared to be shotgun.  He

10   walked over to an SUV that was parked to the north on Ruby

11   Avenue.  As he walked up, he showed that firearm to an

12   individual in that SUV.  Ernest Lucas at one point had walked

13   out and was standing next to Spruell.  Spruell then took the

14   firearm back to the Kia.  It would have been probably minutes

15   later.  Another individual pulled up in a different vehicle, I

16   believe it was a Saturn maybe.  Spruell again showed that

17   individual a firearm.  The person in that Kia -- or that Saturn

18   also pulled out a firearm; appeared to be some kind of a long

19   rifle.  15 minutes later, maybe 20 minutes, Spruell had left,

20   came back in that Kia.  He had encountered an individual by the

21   name of Chaz Hicks outside observed on video.  There appeared

22   to be some kind of an altercation or some words being said

23   between the two.  Mr. Hicks appeared to clutch what appeared to

24   be a pistol in his waist-band.  Mr. Spruell had a shotgun in

25   his hand at one point, but then put it away, and then had

1   walked towards Hicks with no firearm, had some words, it looked

2   like, and then went back to the vehicle, and then Lucas had

3   walked up to the driver's side of that Kia while Mr. Spruell

4   was inside, and he was armed; it looked like an AR 15 rifle.

5   There were some words back and forth, didn't appear to be a

6   violent interaction or anything, and then Mr. Lucas walked

7   away, and the Kia went west on Ruby out of view.

8   Q.   And so a couple follow-up questions on that.  All the

9   events you're describing, were you -- you were able to view

10  these after the fact on the elevated security camera footage

11  that was recorded outside of 875 Ruby?

12  A.   That's right.  There may have been people watching it live.

13  I'm not sure.  I don't remember seeing it live, but it could

14  have been, too.  I mean, we were watching that camera from May

15  the 11th to July the 6th frequently.

16  Q.   So the camera itself, you were able to -- that recording

17  that -- that you watched from June the 6th, you were able to

18  pull some sort of stills from that camera that showed a little

19  bit of what you were describing; is that right?

20  A.   Correct; yes, ma'am.

21  Q.   And is that what is contained in Government's Exhibits 1

22  through 8 as eight photos from that date?

23  A.   Yes.

24          MS. MC FARLANE:  Your Honor, may I approach?

25          THE COURT:  Of course.

1    BY MS. MC FARLANE:

2    Q.   And after you look through --

3             THE COURT:  Do you have a copy for the court?

4             MS. MC FARLANE:  Oh, umm, yes.  Your Honor, I would

5    move to admit Government's Exhibits 1 through 8 at this time.

6             THE COURT:  Any objection, Miss Ramsey?

7             MS. RAMSEY:  No, Your Honor.

8             THE COURT:  So admitted.

9    BY MS. MC FARLANE:

10   Q.   Detective Blackman, do the Government's Exhibits 1 through

11   8, the photos contained within those exhibits, do those depict

12   what you were previously describing?

13   A.   Yes.

14   Q.   Particularly, I want to draw your attention to -- I think

15   it's Government's Exhibit 6.

16   A.   Yes.

17   Q.   And can you describe what's exhibited in Government's

18   Exhibit 6?

19   A.   So that individual wearing a white t-shirt kind of bent

20   over is Austin Spruell.  The shotgun, or what appeared to be a

21   shotgun to me, in his right-hand is on the ground, and then

22   that's Mr. Lucas standing next to it, and that SUV that I was

23   testifying to moments ago is just on the left side; that would

24   be the driver's side window of that vehicle.

25   Q.   Okay.  And this firearm that you -- that you're able to see

1    in these pictures, and that is depicted that Mr. Spruell is in

2    possession of, as you've described in your testimony, that's a

3    different firearm than the firearm on April 11th; is that

4    correct?

5    A.  That's correct.  To my knowledge, this is -- I don't know

6    if that's been recovered or not, this firearm.

7    Q.  Okay.

8         MS. MC FARLANE:  Your Honor, I don't think I have any

9    other questions.

10        THE COURT:  Okay.  Very good.  Miss Ramsey, any

11   cross-examination?

12                       CROSS EXAMINATION

13   BY MS. RAMSEY:

14   Q.  Detective Blackman, I want to first start off by going back

15   to April 11th when the arrest of Mr. Spruell happened, okay?

16   A.  Yes, ma'am.

17   Q.  All right.  If I understand correctly, the marshals were

18   trying to serve a state warrant; is that correct?

19   A.  Yeah, state arrest warrant; correct.

20   Q.  Okay.  And as such, there was an investigation that tracked

21   Mr. Spruell to this home on 2337 South Ninth Street; is that

22   correct?

23   A.  That is correct, yeah.

24   Q.  Umm, and I believe you said you don't -- you're not sure if

25   the marshals ever went up to the door, but they surrounded the

1    house; is that correct?

2    A.  Yeah, I believe the report said they did, but I don't want

3    to say that specifically without going back and referring to

4    their reports.

5    Q.  Okay.  You were present at that time?

6    A.  I was, and I left.  I was actually in surveillance at that

7    time, and then when he went and fled back into the house, I

8    began typing a search warrant, expecting a barricade.

9    Q.  Okay.  Mr. Spruell I think you said comes out of the house

10   and is doing something in the yard?

11   A.  I believe he's on the phone actually, if I can remember

12   now.

13   Q.  Okay.  And I believe you said -- or correct me if I'm

14   wrong, at that time, did you -- what was he wearing?

15   A.  A red -- I think it's a red hoodie or some red top.

16   Q.  But you don't remember anything specific; no specific

17   markings?

18   A.  Yeah, I don't remember specific, no.

19   Q.  Okay.  At some point in time, I think you fast-forward, you

20   said another person comes out of the house also wearing a red

21   top; is that correct?

22   A.  This was after he went back inside the residence?

23   Q.  Uh-huh.

24   A.  Yeah, after some short time, another individual came out

25   wearing a different -- or similar to what was believed he was

1    wearing when he fled in the house.

2    Q.   Okay.  But fair enough, you can't say that it was the exact

3    same shirt that Mr. Ussery -- Mr. Spruell was seen coming out

4    the first time; is that right?

5    A.   That's fair, yeah.

6    Q.   Who is the individual that comes out of the house?

7    A.   I don't remember his name.  It's listed in discovery.  I

8    believe he lived there or was staying there.  A little bit

9    older guy.  He wasn't -- I mean older than Mr. Spruell.  I

10   remember that much about it.

11   Q.   Okay.  Was he subsequently questioned by law enforcement?

12   A.   He was spoken to by an ATF agent just kind of more of a

13   de-brief at that point, because it was, again, barricade

14   situation, what was observed in the house, firearms and stuff

15   like that.

16   Q.   Was this individual -- do you remember their name, so maybe

17   I can stop talking about --

18   A.   The agent?

19   Q.   No, the individual that came out of the house?

20   A.   I don't remember his name.

21   Q.   Okay.  Then I'll just call them the individual.

22   A.   Okay.

23   Q.   After this person was questioned, were they charged with

24   any offense?

25   A.   No.

1    Q.   Were they arrested in any way?

2    A.   Again, I wasn't on scene, but I don't believe so.

3    Q.   Okay.  Do you know if they had any prior criminal

4    convictions or background?

5    A.   I have no idea.

6    Q.   Okay.  You said you left at this point and started getting

7    a search warrant for the house; is that correct?

8    A.   That's correct.

9    Q.   Okay.  Tell me the process in which you did that.

10   A.   So that particular house, there was a -- there wasn't a

11   known -- it wasn't an unknown house to us as ATF, we'd actually

12   pulled trash at the residence before, suspecting some narcotic

13   involvement, so that was -- all ready had been done prior to

14   this.  So I began a search warrant for narcotics, that firearm

15   as well, electronic devices, and some of these came from the

16   reason why we were there to arrest him in the first place, the

17   first crime from March of 2022 which was -- led to the warrant.

18   Q.   Uh-huh.

19   A.   So I go back to the police department, and I just start

20   drafting an affidavit for the search warrant of the residence,

21   getting information from the people on scene.

22   Q.   Okay.  I want to fast-forward to -- so did you get the

23   search warrant on that day?

24   A.   Yes, ma'am.

25   Q.   Okay.  And so you served it on the home; is that correct?

1   A.   That's correct.

2   Q.   And you said that a firearm was found, I believe, in the

3   home in a back closet, wrapped in a shirt; is that correct?

4   A.   Correct.  There was actually two firearms.  One was a

5   Taurus, I remember, and an individual that lived in that house,

6   it was I believe the same person who came out and spoke with

7   agents outside had said that there was a firearm that belonged

8   to them as well and described it, and then they described

9   another firearm that was wrapped in a shirt that allegedly Mr.

10  Spruell had, and it was in the -- both were in this -- that

11  back room.

12  Q.   Okay.  And if I'm correct, the individual -- the second

13  individual is the same individual that comes out of the house

14  that I think you said had -- maybe lived at that residence that

15  you were investigating for narcotics; is that correct?

16  A.   Correct.  Well, let me back up.  There's another individual

17  that resided at that house that we suspected was involved in

18  narcotics.  He was not home at the time.

19  Q.   Understood.

20  A.   There was at least an older female, an older male.  When I

21  say the older male, that was the one that walked out initially,

22  and then there was a -- a Haley Rickets was also inside the

23  residence.

24  Q.   Okay.

25  A.   And I think that's it.

1    Q.   Okay.  Do you know -- it sounds like the individual that

2    came out of the house was at least debriefed by ATF; is that

3    correct?

4    A.   That would be correct.

5    Q.   So do you have any direct knowledge of whether or not that

6    individual was questioned about at the time if they were under

7    the influence of any narcotics?

8    A.   I don't.

9    Q.   Okay.  So you can't answer yes or no?

10   A.   No, ma'am, I wasn't there.

11   Q.   All right.  I want to fast-forward to when you talked about

12   the DNA on the firearm.  How did you get Mr. Spruell's DNA for

13   the comparison?  Did you do that?

14   A.   I did.

15   Q.   Okay.

16   A.   It was a search warrant.

17   Q.   Okay.  Do you remember when that was done?

18   A.   I don't.  Again, it's in discovery.  I don't remember

19   exactly when it was.

20   Q.   Okay.

21   A.   And I believe that may have been a federal search warrant

22   for DNA.

23   Q.   Okay.  And when you got Mr. Spruell's DNA, he was

24   cooperative; is that fair?

25   A.   He was a little upset, but he was cooperative enough, or it

1   wasn't like forced out of him.

2   Q.  Understood.  And was the DNA taken at the Wyandotte County

3   jail?

4   A.  Yes, it was.

5   Q.  Okay.  The original state warrant that the marshals were

6   looking for Mr. Spruell for, ultimately, that case has been

7   dismissed; is that correct?

8   A.  That is correct.

9   Q.  All right.  You said that the DNA on the slide matched

10  Spruell's.  Was the DNA match to Mr. Spruell a match of a major

11  or minor contributor?

12  A.  I'd have to look at the report.  I don't know.  They got

13  the probabilities, and it's a KBI report.

14  Q.  Do you remember whether or not it was a mixture or not?

15  A.  Again, I'd have to look at the report.

16  Q.  Okay.  So you can't -- sitting here today, you don't know

17  what level certainty the DNA from Mr. Spruell is alleged to

18  have matched the firearm?

19  A.  I know that they do have a probability on it, and I want to

20  say it's with the Q, one in I think it's six, but I'd have to

21  again look at the KBI report and the findings to make sure it

22  was a minor mixture, or mixture, and minor or major.

23  Q.  Understood.  The shirt that the firearm was wrapped in, you

24  don't know who that belonged to; correct?

25  A.  I don't.

1   Q.   I want to talk then, move to talking about Government's

2   Exhibits 1 through 8.  I think you only specifically discussed

3   Exhibit 6.  Turning to those exhibits, Government's Exhibits 1

4   through 8 are still slides from a video; is that correct?

5   A.   That is.

6   Q.   All right.  Did you create these actual stills?

7   A.   Umm, I snipped these from the video, so yes.

8   Q.   And again, when you are looking through this video, you're

9   not watching a live feed?

10  A.   I may have been.  I may not have been.  Somebody may have

11  been.  I'm not sure.  I know I historically watched almost all

12  of that video.  I can't -- I can't say for certainty if I was

13  watching it live that day on June the 6th.  I don't remember.

14  Q.   Okay.  Looking at Government's Exhibit 6, it appears to me

15  -- at least the description would be that the images of the

16  individuals in Exhibit 6 look a little grainy.

17  A.   I would disagree with you, just because I watched this

18  since May the 11th and I know these people, so...

19  Q.   Okay.  And how do you know -- so are you saying you know

20  these people, and tell me how you -- you -- how you identified

21  Mr. Spruell in Exhibit 6.

22  A.   I've known Mr. Spruell since probably 2012 or 2013.

23  Q.   Okay.  And so based on that, when you're watching the

24  video, you're saying that this looks like Mr. Spruell.  Is that

25  what you're saying?

1    A.   Correct, yes.

2    Q.   In Government's Exhibits 1 through 6, it looks like there's

3    two vehicles.  One looks like a Jeep, and the other -- I can't

4    read the label, but it's a maroon car.  Would you agree with

5    that?

6    A.   In which exhibit, ma'am?  There's like multiple cars, I

7    think.

8    Q.   Sure.  6, 7 and 8.

9    A.   That's correct, I'd say two vehicles that we can see not

10   counting the motorcycle in Exhibit 5.

11   Q.   Okay.  And then Exhibits 4 and 5, I guess what I'm trying

12   to determine is Exhibits 4, 5, 6, 7 and 8, are those videos all

13   taken at the same time?

14   A.   So when Mr. Spruell first pulled up in the red Kia, the car

15   turned around, it's all the same clip, if that makes sense, and

16   it's only under 15 minutes, and then other cars had pulled up.

17   That Jeep had turned around, and pulled back from east to west,

18   and then the other exhibit, to be more specific, Exhibit 2 is

19   when the -- I believe that's a Saturn had pulled up after, and

20   then that truck was actually in the driveway, and it's backed

21   out and moved.  That Jeep in Exhibit 2 to the right, it will

22   move, and then in the final exhibit, which was Exhibit 1, those

23   vehicles pull up at the very end before Mr. Spruell leaves.  I

24   don't -- I can't give you a window, but it's within I'd say 10

25   to 15 minutes, this all happened.

1   Q.   Okay.  So -- and just maybe my question needs to be

2   clearer.  So Exhibits 1 through 8 that you say show Mr.

3   Spruell, are these all stills from one day?

4   A.   Yes, ma'am.

5   Q.   Okay.  So this is not stills from multiple dates over a

6   period of time?

7   A.   June the 6th.

8   Q.   Okay.

9        MS. RAMSEY:  No further questions.  Thank you, Your

10  Honor.

11       THE COURT:  Any cross-examination, Miss McFarlane?

12       MS. MC FARLANE:  No, Your Honor.

13       THE COURT:  Okay.  Very good.  Any further evidence,

14  Miss McFarlane?

15       MS. MC FARLANE:  Nope, just argument.

16       THE COURT:  Okay.  Miss Ramsey, do you have any

17  evidence?

18       MS. RAMSEY:  No, Your Honor, just argument.

19       THE COURT:  Okay.  Miss McFarlane, why don't you --

20  oh, I'm sorry, you're excused.  Okay.  Miss McFarlane, why

21  don't you let me know how you believe the evidence bears on the

22  Bail Reform Act factors that the court is required to consider.

23       MS. MC FARLANE:  Your Honor, I think that the -- I'm

24  going to start, I guess, with the risk of non-appearance.  I

25  think that that burden has been met by the government by a

1   preponderance of the evidence.  I think primarily, I mean, just

2   focusing on in the bond report the assessment of non-appearance

3   from the probation officer, the substance abuse history, the

4   criminal history, criminal history while under supervision, and

5   then the fact that this defendant was a prior -- has been a

6   prior federal defendant, that while on supervised release,

7   which I would argue is, you know, a fairly -- is a sort of

8   similar type of release that he would be subject to in this

9   case, he had a violation for supervised release, and then his

10  supervised release was revoked.  He had to serve additional

11  time in custody, and then his sentence eventually expired.  And

12  so he's -- he's been through a similar process before, and had

13  violations, and if you look at the -- the description, it's

14  because he tested positive for drugs, and so I think that in

15  addition, Your Honor, in the criminal history, there's an

16  instance in which he was guilty of an eluding, and then the

17  testimony of Task Force Officer Blackman established that he

18  was in the barricade situation for two hours at a residence,

19  and tried to run from officers, and ran onto the top of a roof

20  to avoid trying to be arrested.  And so I think all of those

21  lead to him being a flight risk, and meet the burden by

22  preponderance of the evidence.  And with respect to danger by

23  clear and convincing evidence, Your Honor, what I would point

24  to, in addition to the criminal history which I've all ready

25  mentioned, is the fact that this is a firearm offense.  The

1    defendant, again, has a prior felon in possession of a firearm

2    federal conviction, and just you know, the sentence expired in

3    March, on March 8th of 2022, and then on April 11th of 2022,

4    he's all ready in possession of another firearm, and he's been

5    charged with that.  And then he gets arrested on another

6    unrelated case.  He's taken into custody, according to the bond

7    report.  He bonds out, and bond is posted on May the 4th, 2022,

8    and then on June the 6th, he's seen, again, on an elevated

9    security camera outside of a house potentially having

10   altercations, but he's, as the court can see in the photos, in

11   possession of a separate, larger -- even larger firearm.  And

12   so I think based upon what the court has seen today, and the

13   evidence that's been presented, as well as the information in

14   the bond report, there's not a condition or a combination of

15   conditions that's going to assure that he appears.  I think if

16   15 law enforcement officers in a barricade situation, it takes

17   all of that to get him into custody, the idea that he would

18   appear willingly in court, I have serious doubts that that is

19   something that he would do, given this whole situation that

20   happened just in April of this year, and then additionally,

21   there's no condition or combination of conditions the court

22   could impose that would assure that he not continue to possess

23   firearms.  A house arrest won't help with that.  There just

24   isn't a condition -- unless the defendant is willing to not

25   possess firearms, I don't think there's a condition the court

1    could impose that would prevent him, when all of these other

2    conditions, including supervised release prior, knowing that he

3    would -- you know, because he had the prior FIP case, that he

4    would be a felon in possession of a firearm again, and have

5    another federal case, that wasn't enough to get him to stop

6    possessing firearms.  Being on bond, and being let out on bond

7    in the Wyandotte County case, and then in June, he's out on

8    bond and has possession of another firearm, that wasn't enough.

9    And so I don't think that there's a condition the court could

10   impose that would assure the safety to the community in this

11   case.

12        THE COURT:  Okay.  Very good.  Miss Ramsey, why don't

13   you let me know what conditions you would propose, and how you

14   maintain that those would be sufficient to reasonably assure

15   that the defendant will appear in this action, as well as

16   reasonably assure the safety of others.

17        MS. RAMSEY:  Okay.  Your Honor, I would like to first

18   address a little bit what the government said regarding Mr.

19   Spruell's criminal history.  So if the court considers his

20   first federal case, we're not disputing that there was a

21   revocation in that case.  But where it says sentence expired,

22   Mr. Spruell was released.  On March 31st, 2021, he was released

23   from custody.  He was then on supervised release for

24   approximately a year, and in the community on that term of

25   supervised release.  As the court knows, there are conditions

1    that he submit to urinalysis, there's a condition that he

2    report to a probation officer, there's a condition that he

3    maintain employment.  In fact, he got into an Oxford House

4    in -- in -- prior to that -- to that, once he was -- the first

5    part of his supervised release.  So I would point out that he

6    was able, and has shown historically, that any conditions

7    required by the court, particularly which are enforced by

8    pretrial services or a probation officer, Mr. Spruell shows a

9    history of doing so.  He ultimately successfully completed that

10    term of supervised release, and so we did want to point that

11    out to the court.  It wasn't just that his sentence -- there

12    was some sentence that expired.  No, he completed supervised

13    release, and abided by -- therefore, abided by all those

14    conditions.  I do want to talk a little bit about the -- the

15    next criminal history list here, and this has to do with

16    regarding Mr. Spruell's likelihood of appearance.  It does show

17    that he was on probation for 18 months, and there was one

18    warrant issued.

19          THE COURT:  Where are we looking at now?

20          MS. RAMSEY:  Sorry, we're on Page 4.  We're looking at

21    Wyandotte County District Court Case 19 CR 00529.

22          THE COURT:  Okay.  Okay.

23          MS. RAMSEY:  And then we're going to go over to

24    Page 5.  Ultimately, that probation was revoked, but it says

25    modified to nine month sentence.

1          THE COURT:  Uh-huh.

2          MS. RAMSEY:  And if the court notices, the next entry

3    for the arrest actually in this -- that state warrant they were

4    looking for Mr. Spruell in this case were the kidnapping,

5    robbery and battery.  That case was ultimately dismissed.  The

6    unfortunate part for Mr. Spruell is that he was in custody for

7    a period of time awaiting for that case to be dismissed, and

8    that revocation for probation was pending.  Ultimately, I think

9    he was revoked for not reporting, but he's done with that case,

10   and time was served, and a large portion of that, that nine

11   month sentence, time was served because he was sitting waiting

12   for the secondary -- the second case which he was arrested for

13   on March 25th, or that occurred on March 25th that was

14   ultimately dismissed.

15         THE COURT:  Okay.

16         MS. RAMSEY:  The last entry, the criminal history

17   entry in Wyandotte County case, we're still on Page 5, in 2 CR

18   00287, there is a failure to appear there.  In talking to Mr.

19   Spruell, what he explained to me is that -- and you'll see that

20   in the dates, he explained to me that he thought -- he was

21   unaware that he had a court date on July 12th of 2022.  We then

22   -- when that said warrant served, he actually turned himself in

23   three days later after learning from his bondsman that warrant

24   was issued.  So that warrant was served on him.  He did then go

25   into custody, and that case was ultimately dismissed.  So I

1    wanted to give the court a little background about that

2    timeline, and I do think it says a lot that Mr. Spruell turned

3    himself in on that case.

4         THE COURT:  Okay.  Thank you.

5         MS. RAMSEY:  I think there are other things for the

6    court to consider in the bond report regarding whether or not

7    the government has met their burden in proving that Mr. Spruell

8    is a danger to the community or a flight risk.  The bond report

9    points out, and it was able to be verified by probation and

10   pretrial, that he does have a home plan.  He has a home plan

11   with two friends of his, the Ledbetter's.  Mr. Ledbetter is

12   actually here in support of him in court.  He's lived with them

13   before.  There are no guns in the home, there's no one on

14   probation or parole.  As far as we know, there's nothing about

15   that residence that the court, I think, would have to question

16   about it.  Whether or not it's a suitable home plan.  So he has

17   a home plan.  He's from the area.  He has ties to the

18   community.  Mr. Spruell's also informed me that he believes

19   that he could return back to work at the Waffle House where

20   he's worked before.  That is listed as a place where his

21   girlfriend works.  He believes he can reside -- I'm sorry, work

22   there.  When I asked him about whether or not we could get any

23   verification, he said he'd talked to the manager there, but

24   unfortunately, until he was released, they weren't able to give

25   him a letter of employment or verification, but he's assured me

1    that he spoke with the manager, and that he can be employed

2    there.  So I think two of those things, as far as his history

3    and ties to the community and employment, I would -- we ask the

4    court to consider whether or not having those things in the

5    community reduces any concern about danger to the community.

6    The other issue that comes up in the bond report is substance

7    abuse.  I think one of the conditions the court can impose

8    would be just have Mr. Spruell submit to random UA's, and

9    possibly an evaluation, and substance abuse treatment regarding

10   that particular aspect.  So overall, we do not believe that Mr.

11   Spruell is a danger to the community, or that the government's

12   met their burden.  I also don't think he has a long history of

13   being a flight risk and failure to appear.  I know that there's

14   really no question that Mr. Spruell has had some criminal

15   history, some juvenile criminal history, but it's been some

16   significant amount of time since he's appeared in front of this

17   court again.  So we would ask the court to consider releasing

18   him with the condition -- multiple conditions, that he report

19   to pretrial services officers, that he submit to random UA's,

20   get a substance abuse evaluation, and go to treatment if

21   required, that he reside with the home plan that's all ready

22   been given to the court, and that he maintain employment.  I

23   think it's also important not only to note that he was able to

24   abide by those conditions on his last term of supervised

25   release, is the court to consider that that would be almost the

1    same conditions that this court would impose, and he's shown

2    the history of being able to abide by those, and so I don't

3    think the court -- and that's most recent history in 2022.  So

4    we ask the court to consider that fact when thinking about what

5    conditions to impose, out of the same office that would kind of

6    be -- he would be reporting to.

7          THE COURT:  Okay.  Anything else, Miss Ramsey?

8          MS. RAMSEY:  No, Your Honor.

9          THE COURT:  Okay.  Miss McFarlane, anything further on

10   your end?

11         MS. MC FARLANE:  I don't have anything further.

12         THE COURT:  Okay.  Very well.  Give me just a minute

13   here to collect my thoughts.  Okay.  I am going to grant

14   government's motion for detention.  I do find that -- that the

15   government -- that this is a case that qualifies for detention

16   under 3142 F 1 E, and that this is an offense involving a

17   firearm.  I also find that the government has proven by clear

18   and convincing evidence that no condition or combination of

19   conditions of release will reasonably assure the safety of any

20   other person in the community, and also by a preponderance of

21   the evidence, that no condition or combination of conditions of

22   release would reasonably assure that the defendant will appear

23   as required.  In making this determination, I have considered

24   the factors that the Bail Reform Act requires the court to

25   consider as set forth in 18 USC Section 3142 G by taking into

1    account the available information concerning these factors.

2    This includes the evidence, proffers and arguments presented

3    today, as well as the information set forth in the pretrial

4    services report.  I turn first to the nature and circumstances

5    of the alleged offense which involves a firearm.  But also,

6    more specifically, as to the particulars of the offense in

7    terms of the execution of the warrant that led to discovery of

8    the firearm in question.  The attempts to escape apprehension

9    by law enforcement officers are quite shocking in this case as

10   described by Officer Blackman, in that it did involve a

11   barricade situation for about one to two hours where the home

12   was surrounded by 10 to 20 law enforcement officers.  Moreover,

13   weight of the evidence against the defendant, it appears to me

14   to be at least relatively strong at this point.  I -- you all

15   might be able to put forth a more colorable case based on the

16   DNA evidence at trial, but certainly, the firearm in question

17   was found in a small room in the back of the house with the gun

18   wrapped in a shirt, and all indications from Mr. Spruell's

19   actions that day certainly indicate that he was aiming to avoid

20   apprehension, including having been seen in the red hoodie, and

21   then sending -- and then someone else emerging from a red

22   hoodie, and then -- and indicating Mr. Spruell was armed

23   inside, and then his attempts to escape apprehension by fleeing

24   from the residence itself, and scaling up the side of the

25   neighbor's house onto the roof, where officers had to surround

1    the house, and he was eventually taken into custody, and so
2    certainly, that indicates a desire to avoid apprehension by law
3    enforcement officers, as well as to escape responsibility for
4    whatever was in the house as well.   I've also considered Mr.
5    Spruell's employment history, and I appreciate that he says he
6    could go get a job now, but he has -- doesn't have a stable
7    employment history to speak of, and I can tell from the
8    pretrial services report, it indicates that his longest
9    full-time job was a four-month job for Heartland Signs, and
10   last employed at Liberty Fruit for one week.   And so there
11   doesn't seem to be a stable employment history there.   He also
12   does not have a stable residence in that he has been in
13   custody.   I appreciate that there is a release plan where he
14   would reside with the Ledbetter's, and I appreciate that, but
15   whether or not that's a stable release plan would remain to be
16   seen.   He certainly, at least at this point, does not have a
17   stable residence of his own.   He does have some community ties
18   to the area, but I don't necessarily think that those are good
19   in that area in that it seems that he has affiliated with, at
20   least from the pictures, folks who are not helping him make
21   good choices.   And so he also has a history of drug or alcohol
22   abuse, and that is, various points in time, he was reportedly a
23   daily user of marijuana, and in another period of time,
24   methamphetamine, and also K2 while in custody.   He did, as I
25   can tell from the pretrial services report, three stints at

1   in-patient treatment, and has lived in sober living houses.

2   And so it appears that there is a potential desire to get sober

3   there, but whether or not he can do that remains to be seen.

4   But I'm perhaps most troubled in this case, amongst all of the

5   things, by his criminal record.  And in particular, a serial --

6   a serial affinity for firearms, in that he had his first

7   federal conviction for a federal firearms offense where he was

8   arrested at age 22, pled guilty, and sentenced to 30 months in

9   custody in 2016, was unable to successfully complete his term

10  of supervised release, and had that revoked in 2020.  He was

11  re-sentenced to another 21 months in custody.  While on -- his

12  first revocation, he tested positive for methamphetamine,

13  cocaine, Benzodiazepine, marijuana and K2.  He was arrested for

14  possession of methamphetamine on a vehicle theft and

15  obstruction, and he pleaded guilty to possession of

16  methamphetamine, and was sentenced to probation.  Also, after

17  he completed in-patient treatment, and moved to a sober living

18  house, and had maintained employment, it appears, for a while

19  at HyVee, all of a sudden, he stopped reporting, failed to

20  report to the probation, and stopped reporting to work, and

21  failed to report for out-patient treatment, leading to his

22  supervision being revoked.  I appreciate that once he was

23  released after that in 2021, I appreciate Miss Ramsey pointing

24  out that he was compliant with his supervision apparently for

25  about a year, and I think that that's admirable, Mr. Spruell.

1    However, as soon as that sentence expired on March 8th of 2022,

2    and this really gets to the root of the problem, is that he

3    went right back to being involved with firearms.  Here, he's

4    just served a pretty lengthy stint in federal incarceration,

5    the consequences of supervised release, and just -- gosh, just

6    over a month later, the subject offense occurs where this

7    firearm is found in his home, and is linked to him by DNA

8    evidence.  And then he attempts to abscond and escape

9    apprehension.  And so -- and not only that, but after he was

10   released from bond in that Wyandotte County case, we have these

11   pictures in Government's Exhibits 1 through 8 taken from a

12   surveillance camera on June 6th where Mr. Spruell is clearly

13   showcasing firearms on a public street.  These pictures are

14   worth a thousand words really in terms of what's going on out

15   there.  So he knows he's not supposed to have firearms.  He's

16   all ready served time in federal custody because of firearms,

17   and yet, he persists in that behavior.  And so I've also

18   considered his record on supervision, and aside from the one

19   year between March of 2021 and March of 2022, he really does

20   not have a strong record of having succeeded on supervised

21   release, and most importantly, just being unwilling to remain

22   law abiding with respect to firearms offenses.  He also -- he

23   was on probation at the time of the new alleged offense in the

24   Wyandotte County case, and also had a warrant for his arrest at

25   that time.  I've also considered the nature and seriousness of

1    the danger to others or the community that would be posed by

2    his release, and to that end, I think that his affinity for

3    firearms, despite having his prior conviction, speaks volumes

4    on that front.  I'm also mindful that the court is required to

5    impose the least restrictive conditions necessary to reasonably

6    assure that defendant will appear at later proceedings in this

7    case, and the safety of others.  Specifically, I have

8    considered the fact that he does have a suitable home plan with

9    the Ledbetter's.  I understand that he believes he can return

10    to work at the Waffle House, and submit to substance abuse

11    treatment, including testing, but it just seems to me that he

12    is just too persistent in terms of remaining involved with

13    firearms, and riddled with substance abuse problems

14    historically, that I don't have confidence that that plan, even

15    though it may be well intentioned, would provide sufficient

16    structure to make sure to reasonably assure that Mr. Spruell is

17    going to both appear in this action as required, and not engage

18    in activity that poses a risk of harm to others.  And so for

19    all of those reasons, I will grant the government's motion for

20    detention.  Okay.  With that, Miss McFarlane, is there anything

21    further we need to take up on behalf of the government?

22          MS. MC FARLANE:  Umm, Your Honor, I don't know if

23    arraignment was completed at the previous hearing.

24          THE COURT:  Okay.  Miss Ramsey, do we need to do that

25    today?

1        MS. RAMSEY:  Your Honor, I do apologize.  I had

2   someone cover that hearing for me.  So just in the interests of

3   making sure it's done, Mr. Spruell, if I may proffer on his

4   behalf, acknowledges receipt of the indictment, waives any

5   further formal reading by the court, and would enter a not

6   guilty plea to the count -- all counts contained, which I think

7   is just Count 1 of the indictment, and deny the forfeiture at

8   this time.

9        THE COURT:  Okay.  Very well then, unless there's any

10  objection, Miss McFarlane, I will enter a not guilty plea on

11  Mr. Spruell's behalf.  Okay.  All right.  Anything further?

12  Thank you for pointing that out, Miss McFarlane.  Anything

13  further, Miss Ramsey?

14       MS. RAMSEY:  No, Your Honor.

15       THE COURT:  Okay.  With that then, Mr. Spruell, you

16  are remanded to the custody of the United States Marshal

17  Service pending further proceedings in this case, and court

18  stands adjourned.  Thank you, everyone.

19       (Whereupon court adjourned.)

20

21

22

23

24

25

1

2                            C E R T I F I C A T E

3

4

5        I, Nancy Moroney Wiss, a Certified Shorthand Reporter and

6    the regularly appointed, qualified and acting official reporter

7    of the United States District Court for the District of Kansas,

8    do hereby certify that as such official reporter, I was present

9    at and reported in machine shorthand the above and foregoing

10   proceedings.

11       I further certify that the foregoing transcript, consisting

12   of 39 typewritten pages, is a full, true, and correct

13   reproduction of my shorthand notes as reflected by this

14   transcript.

15       SIGNED January 19, 2023.

16

17                        S/_____

18                        Nancy Moroney Wiss, CSR, CM, FCRR

19

20

21

22

23

24

25