```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF KANSAS
 2


 3
     UNITED STATES OF AMERICA,
 4                                     Case No. 22-20027
        Plaintiff,
 5
        v.                             Kansas City, Kansas
 6                                     Date:  8/29/2023
     AUSTIN SPRUELL-USSERY,
 7                                     Volume 1
        Defendant.                     (Pages 1-61)
 8   ..................................

 9

10                 TRANSCRIPT OF MOTION HEARING

11           BEFORE THE HONORABLE DANIEL D. CRABTREE
                UNITED STATES DISTRICT COURT JUDGE
12

13   APPEARANCES:

14   For the Plaintiff:    Michelle McFarlane
                           United States Attorney's Office
15                         500 State Avenue
                           Suite 360
16                         Kansas City, KS 66101

17

18   For the Defendant:    Chekasha F. Ramsey
                           Office of Federal Public Defender
19                         500 State Avenue
                           Suite 201
20                         Kansas City, KS 66101

21

22

23

24   _____
          Proceedings recorded by machine shorthand, transcript
25            produced by computer-aided transcription.
```

I N D E X


Plaintiff's Witnesses:                                      Page

JAKOB BLACKMAN
   Direct Examination By Ms. McFarlane              5
   Cross-Examination By Ms. Ramsey                 34


E X H I B I T S

| Plaintiff's Exhibits | Offered | Received |
|---|---|---|
| 1 | 28 | 28 |
| 2 | 16 | 17 |
| 3 | 16 | 17 |
| 4 | 16 | 17 |
| 7 | 16 | 17 |
| 10 | 31 | 31 |
| 11 | 31 | 31 |
| 12 | 31 | 31 |
| 13 | 31 | 31 |

| Defendant's Exhibits | Offered | Received |
|---|---|---|
| 801 | 52 | 52 |

 1        (Court called to order.)

 2        THE COURT:  Good afternoon.  We're here in

 3  Case No. 22-20027.  It's captioned the *United States of America*

 4  *against Austin Spruell-Ussery*.  Let me begin by hearing the

 5  appearances of counsel starting with counsel for the United

 6  States.

 7        MS. MCFARLANE:  May it please the court, Michelle

 8  McFarlane appearing on behalf of the United States.

 9        THE COURT:  Ms. McFarlane, good afternoon.

10        And for Mr. -- if I'm mispronouncing it, please

11  correct me.  Mr. Spruell-Ussery --

12        THE DEFENDANT:  Yes, sir.

13        THE COURT:  -- is that right?

14        THE DEFENDANT:  Yes, sir.

15        MS. RAMSEY:  He said "yes, sir."

16        THE DEFENDANT:  Yes, sir, that's right.

17        THE COURT:  Thank you very much.

18        MS. RAMSEY:  Che Ramsey on behalf of Austin

19  Spruell-Ussery who appears in person here this afternoon as

20  well.

21        THE COURT:  Let me check signals with you, Ms. Ramsey.

22  This is your motion to suppress, it's Document 21, and then

23  there was also filed a motion to suppress that was acquired in

24  violation of Rule 41 that's Document 22, and then the amended

25  motion to suppress evidence acquired in violation of Rule 41.

1    I take it that 26 makes 22 moot; is that right?

2              MS. RAMSEY:  That's correct, Your Honor.

3              THE COURT:  All right.  Then I'll ask the deputy clerk

4    to close 22 and we'll focus our efforts this afternoon on 21

5    and 26, which I understood to be both operative motions.

6              I trust that the government has evidence it wishes to

7    offer?

8              MS. MCFARLANE:  Yes, Your Honor.

9              THE COURT:  Is there any other preliminary discussion

10   that we ought to have before we turn to the government's

11   evidence?

12             MS. RAMSEY:  I don't believe so, Your Honor.

13             MS. MCFARLANE:  No, Your Honor.

14             THE COURT:  All right.  Ms. McFarlane, please.

15             MS. MCFARLANE:  Your Honor, we would call Task Force

16   Officer and Detective Jakob Blackman to testify.

17             THE COURT:  Sir, if you'll come to the front of the

18   courtroom but pause before taking a seat to take the oath.

19                        JAKOB BLACKMAN,

20   called as a witness on behalf of the Plaintiff, having first

21   been duly sworn, testified as follows:

22             THE COURT:  Please be seated.  Feel free to move

23   things around so that the microphone will capture your voice

24   easily and comfortably for you.

25             Ms. McFarlane, please.

                      DIRECT EXAMINATION

BY MS. MCFARLANE:

Q.  Can you, please, introduce yourself, including your name

and how you're employed?

A.  Yeah, my name is Jakob Blackman, J-a-k-o-b,

B-l-a-c-k-m-a-n.  I'm a detective with the Kansas City, Kansas

Police Department currently assigned to the Bureau of Alcohol,

Tobacco and Firearms as a task force officer.

Q.  And how long have you been a task force officer with ATF?

A.  The fall of -- late summer 2018.

Q.  Okay.  So about five years?

A.  Correct.

Q.  And how long have you been a detective with KCKPD?

A.  Late summer 2016 I think.

Q.  Okay.  Prior to being a detective, were you employed with

KCKPD in any other capacity?

A.  I was.

Q.  And how long have you been with KCKPD in total?

A.  I was sworn in October 2011.

Q.  Okay.  And when you started with KCK, were you a patrol

officer?

A.  I was.

Q.  Okay.  Do you have any other law enforcement experience or

jobs prior to joining KCKPD?

A.  I worked Leavenworth County Sheriff's Office from 2010 to

1    '11 and United States Navy before that.

2    Q.   Okay.  In order to be a task force officer with ATF, are

3    you a sworn federal law enforcement officer?

4    A.   I am.

5    Q.   Can you talk to us about some of your duties, both as a

6    detective with KCKPD and as an ATF task force officer?

7    A.   Sure.  So it's kind of two-fold.  There's -- I'm assigned

8    to the Violent Crimes Task Force in KCK, which is a local task

9    force that is comprised of multiple federal agencies to include

10   the FBI, the DEA, the ATF, so I'm part of that.  And then I'm

11   part of an ATF group on the Kansas -- in Kansas City that's in

12   charge of the Kansas side, runs from Salina down to Linn

13   County, and work predominantly myself and another task force

14   officer and five or six agents.

15   Q.   And what types of cases do you work and do you investigate?

16   A.   Predominantly federal firearms cases.  However, I've

17   also -- because of the Violent Crimes Task Force, if there's a

18   bullet to skin shooting that someone requests assistance from,

19   I've worked up to including homicide investigations.

20   Q.   And you may have mentioned this, but that Violent Crimes

21   Task Force, is that pursuant to your duties as a KCKPD

22   detective?

23   A.   Correct.  However, the ATF has -- in the last several

24   years, has focused its attention on ballistic casings, crime

25   scenes, shootings.  So it's not uncommon to see federal agents

1    of the ATF to assist in shooting investigations as well.

2    Q.  And assisting in shooting investigations, does doing that

3    type of case work kind of align with both your responsibilities

4    as a KCKPD detective as well as an ATF-TFO?

5    A.  I would agree with that.

6    Q.  Okay.  When you are assigned to work on cases in this area,

7    is it fair to say that, as both a TFO and KCKPD detective, that

8    you are investigating cases and looking for the best way to

9    pursue prosecution?

10   A.  That's correct.

11   Q.  And so as part of your duties and holding I guess both

12   titles and wearing both of those hats, do you frequently submit

13   cases for prosecution to the District of Kansas U.S. Attorney's

14   Office?

15   A.  I do.

16   Q.  And do you also submit cases in your capacity as a KCKPD

17   detective to Wyandotte County or other -- well, to Wyandotte

18   County DA's Office for prosecution?

19   A.  That's also correct, yes.

20   Q.  And have you done that since becoming an ATF-TFO in the

21   last five years?

22   A.  Correct.

23   Q.  So in terms of the types of cases you investigate and you

24   are working on, is there -- are those the same types of cases

25   you're working on and you're just working on them as a ATF-TFO

1    and KCKPD detective?

2    A.   Yeah, sometimes there's some cases that are -- are

3    obviously going to be state in nature because there's not a

4    predicate offense that would -- that would allow federal

5    firearms case; that would be solely a state case.

6    Q.   Okay.

7    A.   It just kind of depends.

8    Q.   And do you work -- have you worked in the past -- do you

9    have any experience working -- in addition to firearms cases

10   you primarily work on, do you also work on drug trafficking

11   investigations?

12   A.   I do.

13   Q.   And can you tell us about some of your experience in drug

14   trafficking investigations?

15   A.   Right.  So when I became a sworn officer in 2011, I was

16   assigned the South Patrol area of Kansas City, Kansas.  And,

17   unfortunately, really no matter where you're assigned there's a

18   high level of narcotics.  So I was exposed relatively early to

19   methamphetamine and trafficking of narcotics.  Basically my

20   whole career has been kind of shifted in that narcotic

21   direction all the way up to when I was promoted in 2016 as a

22   gang detective.  Narcotics are -- became a synonymous feature

23   observed within the gangs as well.  And then as a task force

24   officer with ATF, I've worked numerous conspiracy cases that

25   are attached to firearms nexus as well.

1   Q.  Okay.  Because of your assignment to the ATF and your

2   duties as a task force officer, are you familiar with the

3   requirements that are placed upon you and other members of law

4   enforcement pursuant to the Federal Rules of Criminal

5   Procedure?

6   A.  Yes.

7   Q.  And, likewise, because you also worked as a KCKPD

8   detective, were you aware of the current laws of the State of

9   Kansas and specifically laws that would enable you to search or

10  not search a property?

11  A.  Yes.

12  Q.  And are you also aware of the laws with respect to -- that

13  the State of Kansas has with respect to firearms violations and

14  drug trafficking investigations?

15  A.  Yes.

16  Q.  Okay.  And do you stay current on all of those laws as part

17  of your job?

18  A.  I do.  I try to.

19  Q.  Is it necessary that -- when you're pursuing charges on

20  somebody that you know -- be able to know readily whether or

21  not they violated the law?

22  A.  Correct.

23  Q.  I want to talk with you now about the case that we're here

24  today to talk about involving the defendant, Austin Spruell.

25  Is Austin Spruell the defendant who appears here today that's

1    seated at counsel table --

2    A.   Yes --

3    Q.   -- the person you know as Austin Spruell?

4    A.   -- that is correct.

5    Q.   Okay.  Can you walk us through how you and other members of

6    law enforcement became aware of Mr. Spruell as relative to this

7    investigation and including approximately when the

8    investigation began what information you received?

9    A.   Right.  So I guess I'll kind of break it down to there

10   ended up being almost two investigations.  Initially, in

11   February of 2022, the ATF, the group I was with in Kansas City,

12   started a crime reduction initiative focused primarily on

13   Southdale Blood Gang and its associates.  Initially that was

14   kind of a fact-gathering phase in the investigation where we

15   took information from carjackings in recent months, made a list

16   and began looking at some of the individuals involved.  Austin

17   initially wasn't a primary focus because I believe he had just

18   recently got out.  We had seen him on social media.

19        But on March 17th, I was actually paged out to a shooting

20   involving an individual by the name of Michael Rojas, which

21   kind of started the second investigation into the shooting that

22   ultimately would lead to a suspect being identified as Austin

23   Spruell.

24   Q.   So that initial investigation that you're talking about,

25   when -- when did all of that come about?

1   A.  We started it in, like, January of '22 when we started,

2   like, piecing it and getting our information and doing

3   intelligence work on possible targets in an investigation to be

4   a longer term --

5   Q.  Okay.

6   A.  -- and then the shooting was March 17th.

7   Q.  And so this defendant, Mr. Spruell, got onto your radar

8   around that same time and prior to that March date; is that

9   right?

10  A.  Correct.  Yeah, again, briefly he wasn't -- actually,

11  Michael Rojas was one of the primary individuals that we had

12  focused on.  Austin I think we had seen on social media.  We

13  knew his Southdale affiliation.  He was in a preliminary report

14  we wrote on starting the investigation, but he was just kind of

15  a someone we noted and would see what would happen as the

16  months unfolded.

17  Q.  Okay.  So it sounds like you didn't get too far into that

18  primary investigation before something else happened in March

19  that kind of shifted the focus; is that right?

20  A.  That's correct.

21  Q.  And that March date, what happened in March of 2022 that

22  shifted your focus?

23  A.  So early morning hours -- I believe it was actually the

24  18th right after midnight.  I don't got the exact time.  Early

25  morning hours I was called by an officer or sergeant from the

1   South Patrol police substation who had said Michael Rojas --

2   Rojas had sustained a gunshot wound to the leg and was at

3   University of Kansas Medical Center and asked if I'd be willing

4   to come start the shooting investigation.

5       That normally was not something I would have primarily been

6   contacted for, but to the fact that they had knowledge of

7   this -- beginning this investigation and Rojas was -- name had

8   came up that they reached out to me.  And I decided I would,

9   and contacted Special Agent Perez of ATF to see if she wanted

10  to accompany me on the shooting investigation.

11  Q.  Okay.  And was this defendant identified as being a

12  potential suspect in that investigation?

13  A.  He was.

14  Q.  Okay.  Was he identified as potentially being armed with a

15  firearm during that incident?

16  A.  He was.

17  Q.  Okay.  Was there a connection between that incident that

18  you were aware of and the house that was eventually the subject

19  of the search warrant that we're going to be discussing today,

20  the 2337 South 9th Street?

21  A.  Yes.

22  Q.  And what's the connection?

23  A.  So initially during the interview of the victim, Mr. Rojas,

24  he had told us that he had driven down with the co-defendant at

25  that state, Brandon Webb, to pick up Mr. Spruell from what he

1    had described as Mikey Jones' house, and was able to show us

2    the residence which we identified as 2337 South 9th Street.

3    Mikey Jones was a known moniker of Michael Kindred.  We had

4    known who he was for a number of years.

5         So when Rojas gave us his accounts of what took place

6    during the shooting and his alleging that he was -- he picked

7    up Mr. Spruell with Mr. Webb and which started the chain

8    leading to the aggravated battery and aggravated kidnapping, I

9    wanted to kind of go back to at least corroborate that

10   Mr. Rojas was telling the truth, if he was being factual on his

11   allegations.

12        So I went back down there, canvassed the neighborhood, was

13   able to get some surveillance footage and speak with some

14   neighbors who had started talking about the address being a

15   known problem.  But that's how we first linked Mr. Spruell to

16   the residence.

17   Q.  And was Spruell eventually charged in Wyandotte County with

18   a state case because of the incident that you're talking about?

19   A.  He was.

20   Q.  And so those were state court charges that were issued in

21   conjunction with a warrant; is that right?

22   A.  Correct.

23   Q.  So is there a warrant that was issued for his arrest in

24   about March of 2022?

25   A.  That's correct.

1    Q.  At some point was that warrant turned over to the U.S.

2    Marshal Service?

3    A.  It was.

4    Q.  And what was the purpose of turning the warrant over to the

5    U.S. Marshal Service?

6    A.  U.S. Marshal Service does a pretty good job.  That's

7    what's their expertise, on fugitive apprehension.  They're also

8    attached -- they have a fugitive unit that's attached and part

9    of the Violent Crimes Task Force.  And when you get a violent

10   felony warrant, it's often considered to give them the warrant

11   and let them try to apprehend the suspect.

12   Q.  Is that true even if it's a state arrest warrant versus a

13   federal arrest warrant?

14   A.  That's correct.  They normally do federal -- or state

15   arrest warrants, but there has to be some sort of a violence

16   nexus historically, murder or shooting.

17   Q.  Okay.  Going back to a little bit that address on

18   South 9th Street, you guys -- you and -- you or other members

19   of law enforcement, you did two trash pulls from that address;

20   is that right?

21   A.  We did.

22   Q.  And why did you do trash pulls from that address?

23   A.  So in the global case, what I call the global case, the

24   initial one that was started in January, once we identified

25   Mikey Kindred's house on 9th Terrace, it became a primary

22-20027  USA v Austin Spruell-Ussery  8.29.23                    15

1   hangout we believed probably for the Southdale Bloods and some

2   of their associates.  We had a couple other moving pieces in

3   this investigation and a couple other addresses that we were

4   focusing on, and we believed it was likely at some point we

5   would consider -- or coming across these same suspects and

6   possible targets at their address.  So we began an

7   investigation into that house like many others in that

8   investigation which led to the initial trash pull.

9   Q.  Okay.  And do you remember the date of the initial trash

10  pull?

11  A.  I believe it was March 31st.

12  Q.  And what types of items were found as a result of the trash

13  pull?

14  A.  I believe there was 12 baggies found in the trash along

15  with some indicia with a name on it on the first one.

16  Q.  Okay.  And were there items -- what was the date of the

17  second trash pull?

18  A.  April the 7th.

19  Q.  And were there items found as a result of that trash pull

20  as well?

21  A.  There was another baggie and what looked like a glass pipe,

22  which would be in the shaft of a -- what looked like a meth

23  pipe.

24          MS. MCFARLANE:  Your Honor, may I approach?

25          THE COURT:  You may.

1    BY MS. MCFARLANE:

2    Q.   I've handed you Government's Exhibits 2, 4, 5 and 7 I

3    believe.

4    A.   I don't see five.  I got 2, 3, 4 and 7.

5    Q.   2, 3, 4 and 7.  Okay.  Do you recognize those exhibits?

6    A.   I do.

7    Q.   And what do those exhibits appear to be?

8    A.   Government's Exhibit No. 2 is the items found on the

9    March 31st trash pull, and there are multiple baggies with two

10   presumptive test kits or testers.

11   Q.   I guess more broadly are those exhibits photographs and

12   depictions of items?

13   A.   Correct, they are.

14   Q.   And in general what do those exhibits -- those photographs

15   depict?

16   A.   Items that were recovered from the trash -- from the trash

17   pulls.

18   Q.   And are those -- those photographs in those government's

19   exhibits, are those fair and accurate representations of the

20   items that were pulled from the trash on the two dates that you

21   identified?

22   A.   Yes.

23           MS. MCFARLANE:  Your Honor, I move to admit

24   Government's Exhibits 2, 3, 4 and 7 as evidence.

25           THE COURT:  Any objection to 2, 3, 4 or 7?

1          MS. RAMSEY:  No objection.

2          THE COURT:  Government's Exhibits 2, 3, 4 and 7 are

3    received.

4    BY MS. MCFARLANE:

5    Q.  Drawing your attention to Government's Exhibit 2, what is

6    depicted in Government's Exhibit 2?

7    A.  Those are the baggies that were found on the March 31st

8    trash pull.

9    Q.  And are there two, like, little cylinders in that picture

10   as well?

11   A.  There are.

12   Q.  What are those?

13   A.  Those are presumptive meth test kits.

14   Q.  Okay.  Did the items that were pulled that are depicted in

15   Government's Exhibit 2 test positive for methamphetamine?

16   A.  Yeah, not all of them.  We would have tested a couple of

17   them.  I would -- the two that -- that are on top of those bags

18   would have been the bags that were used to test.

19   Q.  Okay.  And the -- what is the significance to you as a law

20   enforcement officer, if any, of the number of bags and the

21   items that are depicted in general in Government's Exhibit 2?

22   A.  There's definitely narcotic use in the residence by looking

23   at those bags.  There's not obviously bulk methamphetamine or

24   anything like that on gallon size, but definitely narcotics

25   use.

1    Q.   Okay.  And then drawing your attention to Government's

2    Exhibit 3, what is depicted in Government's Exhibit 3?

3    A.   That was a piece of mail with the name Hailey Ricket on it.

4    Q.   And Government's Exhibit 4, what's depicted in Government's

5    Exhibit 4?

6    A.   That is the bag and the glass pipe that was recovered from

7    the trash on April the 7th.

8    Q.   And what is the significance to you as a law enforcement

9    officer of the items depicted in Government's Exhibit 4?

10   A.   Like Government's Exhibit 2, just narcotics coming from the

11   residence.

12   Q.   And are those test kits that are depicted in Government's

13   Exhibit 4 as well?

14   A.   They are.

15   Q.   And did items that you tested as a result of that second

16   trash pull test positive for methamphetamine as well?

17   A.   They did.

18   Q.   And that -- that, like, glass item that's depicted in

19   Government's Exhibit 4, what is that if you know?

20   A.   It's a glass pipe used to ingest narcotics.  It looks like

21   the shaft of a meth pipe to me.

22   Q.   And turning to Government's Exhibit 7, is that the same

23   item that's depicted in Government's Exhibit 7 or is it a

24   different item or do you know?

25   A.   I believe it's the same one.  Four was just taken later

1   after it was collected.

2   Q.   Okay.  And so based upon -- based upon the items that were

3   seized as a result of the two trash pulls, what was your belief

4   about what was happening or potentially what did you have a

5   belief was happening in that house?

6   A.   So from the trash pulls just kind of confirmed that we were

7   seeing narcotics actually come out of the house, that the

8   neighbor -- speaking with the neighbor and the amount of

9   individuals coming to and from the house early on in the

10  investigation as well as some of the individuals that we would

11  observe over there, we believed that the house was associated

12  at least to some of the people we were investigating, and

13  likely I suspected they were using the house as some sort of a

14  trap house, which is just a known term to use and possess

15  methamphetamine out of as well as individuals will sell drugs

16  from the house as well.

17  Q.   Okay.  And in your experience in working drug cases, are

18  individuals who use methamphetamine, do they typically use it,

19  like, by themselves or is it typical that individuals will

20  gather to use methamphetamine together?

21  A.   It's both, but often times I've seen gatherings.  It just

22  kind of depends I think.

23  Q.   And is it your experience that individuals who use

24  methamphetamine can be involved in the sale of methamphetamine

25  as well?

1   A.  Often.  A lot of users that I have -- a lot of dealers that

2   I've seen are -- also use methamphetamine as well.

3   Q.  Okay.  In turning back to Government's Exhibit 3 really

4   quick, the -- the mail that's depicted in Government's

5   Exhibit 3, it appears to me that there's not an address that's

6   indicated on the outside of that envelope.  Is that...

7   A.  That's correct, I don't see an address.

8   Q.  Okay.  Do you remember if there was an address on it or --

9   A.  I don't.  I don't.  I mean, it can be at the top left.  I

10  don't remember an address.

11  Q.  Okay.  The name that's depicted on there, Hailey Ricket,

12  does that name mean anything to you in the context of this

13  investigation?

14  A.  It does.

15  Q.  And who is Hailey Ricket?

16  A.  Hailey Ricket was the -- the presumed girlfriend of

17  Mr. Spruell at the time and also alleged to be in the back seat

18  of the vehicle during the shooting of Michael Rojas on

19  March 17th.

20  Q.  Okay.  Was Hailey Ricket a person who, based upon your

21  investigation, you knew to live at that house on

22  South 9th Street?

23  A.  No.

24  Q.  Okay.  Was Austin Spruell a person who you thought or knew

25  was living at that house on South 9th Street?

1   A.   No.

2   Q.   Okay.  Let's talk about the date of Mr. Spruell's arrest on

3   April 11, 2022.  So at this point the arrest warrant for that

4   state case had been turned over to the U.S. Marshals; correct?

5   A.   Correct.

6   Q.   And did you become aware, on April 11th, 2022, at some

7   point that Mr. Spruell had been spotted somewhere and that the

8   marshals were attempting to arrest him?

9   A.   I was.

10  Q.   And can you tell us about when you became aware of that

11  where Mr. Spruell was seen?

12  A.   Yeah, it would have been the late morning hours.  I guess

13  that's not specifically.  Maybe, like, 10:00 or 11:00 in the

14  morning is when I was contacted by a Deputy U.S. Marshal that

15  believed Mr. Spruell was going to be at the address on

16  South 9th Street.  And I'd asked him if he needed any help with

17  surveillance.  They were going to be the primary arresting, but

18  sometimes the marshals will go out with as many people are

19  available and to assist with doing surveillance.  He said yes,

20  so myself and a couple agents went out to assist with

21  surveillance.

22  Q.   And you said that they -- that the marshal that contacted

23  you thought that he was going to be at that address on

24  South 9th Street.  Was he spotted at that address?

25  A.   Right.  He actually had said he thought he watched him walk

1   into a back alley into the residence.

2   Q.  Okay.  And were -- as far as you know, were the marshals

3   sitting on that house waiting for him to come in or out of it?

4   A.  No.  So they had requested and secured precision cellular

5   phone pings for the apprehension process.  So I'm not sure

6   exactly what brought them down.  I believe the phone pings in

7   general brought them down to that area and then they observed

8   him walking.

9   Q.  Okay.  And so -- so he was spotted outside of that house,

10  but the U.S. Marshal who contacted you said that he was going

11  into the house on South 9th Street?

12  A.  Yeah, I believe he was actually wearing a red hoodie.  He

13  couldn't identify him a hundred percent it was him walking

14  towards the back alley and maybe went into the back of the

15  house, but they weren't comfortable enough saying it was him at

16  the time.

17  Q.  Okay.  So you and other members of ATF went to go assist

18  with that; is that right?

19  A.  Yeah, more preparing for a rolling surveillance.  If he

20  would have got picked up in a vehicle and goes in a car, we

21  could follow the car.  That was the plan.

22  Q.  Okay.  So what happened next after you went out to that

23  scene to assist?

24  A.  At one point Mr. Spruell came out in the front of the

25  residence.  He was on a cellular phone talking, red hoodie.  I

1   think he had kind of a red garment around his chin.  And then

2   the marshals decided to try to make contact and arrest him.

3   And when they did, Mr. Spruell fled back into the residence.

4   They tried to get him to come out, and he wouldn't come out.

5   Q.  Okay.  So did anybody at that point, like, go into the

6   house to try and get him arrested?

7   A.  They did not.

8   Q.  And why, if you know, didn't you and other members of law

9   enforcement go into the house to go and get him?

10  A.  I can tell you why I wouldn't have gone in the house right

11  away.  I don't know exactly why they didn't.  I know at one

12  point somebody came out and said Mr. Spruell was armed with a

13  firearm, and it's more of a protocol to call a barricade.  It's

14  a violent warrant and let the SWAT Team -- local SWAT Team come

15  in and start.

16  Q.  Okay.  So during the time that Mr. Spruell was in the house

17  on South 9th Street, it was reported at least that he was armed

18  with a firearm?

19  A.  Correct.

20  Q.  So what were you doing during this time?

21  A.  As soon as Mr. Spruell ran into the residence and they had

22  called the barricade, which is basically a term starting an

23  evolution of a SWAT Team coming out, it can be a really long

24  process, I went back to the KCKPD and began writing -- drafting

25  a search warrant.  Knowing that it wasn't a first-party

1   residence for Mr. Spruell, a search warrant was going to be

2   requested as well.

3   Q.  And when you say first-party residence, can you explain

4   that a little bit more?

5   A.  Yeah, so we -- on first -- just knowing that the person

6   lives there and has residence at the address, there was nothing

7   that we had could show that he actually resided at that house.

8   And that question was asked by the U.S. Marshal Service, and it

9   just there wasn't enough information to say that, and the plan

10  was not -- to go ahead and treat it that.

11  Q.  And so if it's not a first-party residence, your training

12  tells you that you should seek a search warrant for the house

13  in order to go effect your arrest rather than simply going into

14  the house to effect the arrest?

15  A.  Correct.

16  Q.  And so that is a search warrant to search the house itself

17  or is it more --

18  A.  That's more of a body warrant for the person.  It's not

19  probably the right term to use, but it's more for a person.

20  Initially when he went in the decision was they're not going to

21  go in, I was starting back to draft -- to start drafting the

22  search warrant for the residence.  Initially it was possibly a

23  body warrant until I learned more information from

24  investigators on scene as to what was taking place.

25  Q.  So when you went back to KCKPD to start writing the search

1   warrant, it was specifically for the purpose of having legal

2   authority to go into that house on South 9th Street to

3   apprehend Mr. Spruell on his state arrest warrant?

4   A.   Correct, that was the initial plan when he ran back in the

5   house.

6   Q.   Okay.  So what -- what changed?

7   A.   At one point an individual exited the house dressed in what

8   appeared to be the same hoodie or similar hoodie that he was

9   observed, "he" being Spruell, prior to him fleeing in the

10  house.  And -- and an agent spoke with him and that individual

11  had said that Mr. Spruell stripped off his hoodie, told him to

12  put it on and go outside hoping that they would think it was

13  the wrong person, and the individual also said he was armed

14  with a firearm in the house.

15  Q.   Okay.  And so what happened after that?

16  A.   I don't really got the exact times.  I think it was

17  probably within 15 minutes Mr. Spruell exited the house and

18  fled on foot -- this is in the middle of the -- of the very

19  infancy stages of drafting a warrant -- and ran up and jumped

20  on a roof of a house, and they surround -- "they" being the

21  marshals and agents and KCK SWAT officers -- surrounded the

22  house and were able to convince Mr. Spruell to surrender

23  himself from the house -- from the roof of the house.

24  Q.   Okay.  And while -- while that was all going on and law

25  enforcement was dealing with that access to the

1    South 9th Street location, you were still working on the search

2    warrant?

3    A.   Yes.

4    Q.   And the -- the search warrant that you were working on was

5    for that South 9th Street house for the purpose of seizing

6    what?

7    A.   It was actually many things.  I found out that the gun

8    information -- that he was armed with a firearm and then he

9    came out not with a firearm.  I knew he was on a cellular phone

10   initially when he was outside, and he came out of the house not

11   with a cellular phone.  I was still investigating the

12   aggravated battery, aggravated robbery case from March 17th.

13   That was less than a month later this incident took place.  So

14   I wanted to get evidence from that crime, as well as the house

15   had obviously been what I considered a trap house or house

16   where there was sales and uses of narcotics out of.

17       I had been in contact with Captain Diaz of the KCKPD.  He

18   was a commander of the South Patrol area.  They had had

19   multiple complaints on the residence as well.  And while we

20   were going in, they shut down the trap house, I went ahead and

21   included all the narcotics stuff on it as well.

22   Q.   Okay.  And so the part -- so you were specifically writing

23   an affidavit for a search warrant?

24   A.   I was, yes.

25   Q.   And did you or someone else prepare the affidavit as well

1    as the actual warrant itself?

2    A.   Yes.

3    Q.   And was that affidavit and warrant submitted to a

4    Wyandotte County judge?

5    A.   It was.

6    Q.   And was it signed eventually by a Wyandotte County judge?

7    A.   Yes.

8         MS. MCFARLANE:  Your Honor, may I approach?

9         THE COURT:  You may.

10   BY MS. MCFARLANE:

11   Q.   I just handed you what's been marked for this hearing

12   Government's Exhibit 1.  Do you recognize what that is?

13   A.   I do.

14   Q.   And what does that appear to be?

15   A.   The affidavit and the warrant itself for 2337 South 9th.

16   Q.   The same affidavit and warrant we've been talking about?

17   A.   Yes, ma'am.

18   Q.   Okay.  And is that affidavit and warrant the -- the version

19   that you signed as well as the one that the judge signed?

20   A.   Yes.

21   Q.   Okay.  So this is the final warrant that was executed?

22   A.   It is.

23   Q.   And does it appear to be changed in any way since you saw

24   it back on April 11th, 2022?

25   A.   No.

1       MS. MCFARLANE:  Your Honor, I'd move to admit

2   Government's Exhibit 1 into evidence.

3       MS. RAMSEY:  No objection.

4       THE COURT:  Any objections?

5       MS. RAMSEY:  No objection.

6       THE COURT:  Exhibit 1 is received.

7   BY MS. MCFARLANE:

8   Q.  And after this -- after Government's Exhibit 1 was signed

9   by the judge in Wyandotte County, did you and other members of

10  law enforcement execute that search warrant?

11  A.  We did.

12  Q.  So when you were including -- you mentioned a little bit

13  ago when you were including information into the warrant, did

14  you include both information from that aggravated battery that

15  you were investigating from March of 2022 as well as sort of

16  what you identified as the broader investigation as well?

17  A.  Yes.

18  Q.  And was that information all included in that affidavit

19  because it went to the probable cause to search the house in

20  your opinion?

21  A.  Correct.

22  Q.  Okay.  As a result of the search of that house on

23  South 9th Street, were there items that were taken and were

24  seized as -- as your evidence or contraband?

25  A.  They were.

22-20027  USA v Austin Spruell-Ussery  8.29.23                    29

1   Q.   What -- what types of items were seized?

2   A.   There was at least two if not three cellular phones taken.

3   There were drug paraphernalia.  There was a small amount of

4   methamphetamine found in a plastic container in the bedroom who

5   we believe was Michael Kindred, who was not actually at the

6   address the day of the warrant.  And then two firearms found in

7   the back closet area of one of the bedrooms.

8   Q.   And was one of the firearms not seized as evidence or was

9   it seized as evidence and later released?

10  A.   I believe that's what the case was on the Taurus, the

11  silver Taurus.

12  Q.   And is that because -- well, why did that happen?

13  A.   It was on -- firearms were on the warrant in general, and

14  we needed to prove some sort of ownership before we release a

15  gun back to somebody.  I'm not sure if that gun's been

16  released, the Taurus.  It may or may not have been.

17  Q.   But, in any event, that Taurus you identified is -- there's

18  a person who has identified that that's their firearm?

19  A.   Yes.

20  Q.   Okay.  And then there was another firearm that was seized,

21  which firearm was that?

22  A.   That was a Glock Model 22, .40 caliber pistol.

23  Q.   Is that the same firearm that's -- Mr. Spruell has been

24  charged with in his indictment as being a felon in possession

25  of?

1  A.  Yes, ma'am.

2  Q.  You mentioned some cell phones.  Was one of the phones

3  seized Mr. Spruell's cell phone?

4  A.  Yes.

5  Q.  And how did you identify that it was Mr. Spruell's cell

6  phone?

7  A.  That came later, confirming on the search warrant that was

8  requested and secured, I believe, the day or two after, but we

9  also had called that phone number that the marshals were

10  pinging that day, which that phone rang, which identified that

11  as a phone we -- they believed was going to be his -- his

12  phone.

13  Q.  Okay.

14      MS. MCFARLANE:  Your Honor, may I approach?

15      THE COURT:  You may.

16  BY MS. MCFARLANE:

17  Q.  I have handed you Government's Exhibits 12, 11, 13, 14.

18  A.  10.

19  Q.  10.

20  A.  10, 11, 12 and 13.

21  Q.  10, 11, 12 and 13.  And what do these exhibits appear to

22  be?

23  A.  These are photographs from within the residence taken after

24  the search warrant.

25  Q.  Are these photographs fair and accurate depictions of the

1    items that were seized pursuant to the search warrant that

2    we've been discussing?

3    A.   Yes.

4         MS. MCFARLANE:  Your Honor, I'd move to admit

5    Government's Exhibit 10, 11, 13, 14?  Into evidence.

6         THE COURT:  I think -- I think the witness has

7    testified -- I think the witness testified about 10, 11, 12 and

8    13.  I did not hear a foundation for 14.  Perhaps I'm mistaken.

9         MS. MCFARLANE:  Your Honor, I apologize, that's right.

10        THE COURT:  Then the offer is of Government's

11   Exhibits 10 through 13, including 10 and 13.  Any objection?

12        MS. RAMSEY:  No, Your Honor.

13        THE COURT:  They're received.

14   BY MS. MCFARLANE:

15   Q.   So looking first at Government's Exhibit 10, what's

16   depicted in Government's Exhibit 10?

17   A.   Those are firearm magazines.  Those were on the bed

18   frame -- or box springs in Michael Kindred's room underneath

19   his mattress.

20   Q.   Okay.  And what's Exhibit 11 depict?

21   A.   That's the Glock Model 22, .40 caliber pistol that was

22   found in that back closet.

23   Q.   And that's the same one that you previously identified that

24   you believed belonged to or was possessed by Mr. Spruell?

25   A.   Correct.

22-20027  USA v Austin Spruell-Ussery  8.29.23                    32

1  Q.  And why -- what evidence, I guess, do you have that you

2  rely on that that was Mr. Spruell's firearm?

3  A.  DNA came back on that firearm as well as information from

4  his cellular phone.

5  Q.  Okay.  What I meant was at the time why did you believe

6  this was his firearm at the time?

7  A.  This was a gun that wasn't accounted for.  Somebody had

8  said -- I didn't talk to the person, so I'll be careful how I

9  word this.  There was somebody who had said that -- that came

10  out of the house, "That husband or wife's gun may be in there,"

11  and identified it as a Taurus.  And this was the firearm that

12  was not the Taurus, so that's the one we believe was his.

13  Q.  Okay.  And what -- what is depicted in Government's

14  Exhibit 12?

15  A.  Twelve is just some writing on the wall in one of the

16  bedrooms.  I believe it's the room in and to the left as you

17  came in the front door, which kind of confirmed what we

18  initially thought the house was, more of a trap house.  And

19  there's a little writing on the wall where it's talking about

20  trap in quotations.

21  Q.  Okay.  And what's depicted in Government's Exhibit 13?

22  A.  Just some more graffiti, notable Southdale graffiti on the

23  wall, which was the initial gang we were investigating, and

24  just some names that are -- some are familiar and not familiar

25  to the investigators.

1    Q.   Okay.  And the -- that writing that's depicted in those --

2    those two exhibits, did that further your belief, I guess, that

3    -- of what this house on South 9th Street was used for?

4    A.   Yeah, it kind of confirmed it for me.

5    Q.   Okay.  And so based upon your training and experience and

6    your work as an investigator, what do individuals use a trap

7    house for, what's the use of a trap house?

8    A.   In the methamphetamine community, there's -- often times

9    people are homeless, they're struggling.  Trap houses you can

10   go sleep in, you can stay the night in, you can use drugs in.

11   There's people who historically have brought drugs into the

12   house and sold drugs from the house.  It's just kind of a

13   central area where people can -- can go to.

14   Q.   That cell phone that you identified as Spruell's cell

15   phone, where was it seized from if you know?

16   A.   It was the back laundry room.  If you were to walk in the

17   front door, walked all the way to the back of the residence,

18   that was a bedroom.  If you turn left, there was a closet,

19   which is where the firearms were found.  If you would have

20   turned right, there was a laundry room, and it was on the

21   floor.

22   Q.   Okay.  And so it was in the same general area as the

23   firearm?

24   A.   I would call it on the other side of a room in the first

25   adjacent room.

1   Q.  Okay.  Okay.  All this evidence that you've mentioned that

2   was seized from that house on South 9th Street, where was it

3   taken after it was seized?  Where was it stored?

4   A.  KCKPD.

5   Q.  Okay.  And that firearm Mr. Spruell's been charged with,

6   that Glock, was that eventually moved and is it currently in

7   ATF custody?

8   A.  It is.  It's currently in ATF custody.

9   Q.  Okay.  And was the evidence initially seized and taken into

10  KCKPD pursuant to that state court case?

11  A.  Correct.

12  Q.  Okay.  Do you know the outcome of that -- that state court

13  case --

14  A.  The aggravated battery case?

15  Q.  -- that Mr. Spruell was charged with?

16      Yeah.

17  A.  It was ultimately dismissed.  Our victims feared to

18  cooperate and prosecute.

19          MS. MCFARLANE:  Your Honor, I don't believe I have any

20  other questions.

21          THE COURT:  Wish to cross-examine?

22          MS. RAMSEY:  Yes, Your Honor.

23                          CROSS-EXAMINATION

24  BY MS. RAMSEY:

25  Q.  Detective Blackman, I want to start -- I'm unclear about

1   the timeline of events.

2   A.   Sure.

3   Q.   My understanding is that the Violent Crimes Task Force met

4   and was set up and working in about February of 2022; is that

5   right?

6   A.   The task force in general?

7   Q.   Yes.

8   A.   That's been -- that's been going on since 2016.

9   Q.   Was there something in February of 2022 that acted as kind

10  of an initiative for --

11  A.   I think that's what I -- that's not the Violent Crimes Task

12  Force, ma'am, that's the ATF initiative, the crime reduction

13  act -- well, I don't know if it was an act but it was something

14  that started an investigation that was on the ATF side by the

15  DOJ I believe.

16  Q.   And were you aware of that investigation?

17  A.   It was -- that was -- that was basically tasking

18  investigators to start something, which was my group.

19  Q.   Okay.  So that was an ATF group that then started the

20  violent initiative group that you were a part of to start --

21  A.   Not the group but the investigation.

22  Q.   The investigation part.

23  A.   Myself, my partner who's an agent with ATF and my group in

24  general started.

25  Q.   Okay.  And so then under that umbrella you guys had an

1   investigation into Michael Rojas; is that correct?

2   A.   So Michael, when I -- in the very beginning, when we

3   figured -- we started this case, we began gathering information

4   from likely targets.  Mike Rojas's name came up in that

5   initially as someone that was causing problems in the

6   community.  He was more of a focus initially on the

7   investigation, which ultimately led them contacting me when he

8   was shot.  So my suspect became my victim and -- in essence.

9   Q.   And I think as you said tangentially through that

10  investigation you started investigating, Mr. Spruell's name

11  came up, you started investigating Mr. Spruell?

12  A.   Yeah, Austin's name came up early as possible Southdale

13  Blood affiliate because the name is what we were investigating,

14  but just because we knew he was out, just because we knew he

15  was on social media.  There was nothing at that point early on

16  that was pinpointed to him doing anything.

17  Q.   Okay.  Now, I want to talk to you about in this case there

18  was a pole cam set up at 2 -- at least not set up on but a pole

19  cam set up to surveil 2337 South 9th Street; is that correct?

20  A.   That's correct, yeah.

21  Q.   What was the purpose of that pole cam?

22  A.   For the same reason on the global scale of the case,

23  South 9th Street was one address among others that this group

24  was hanging out at.  So we -- it was a problem.  We'd known it

25  was a problem.  We began watching to see what the activity was

1   going to be.  We knew we would likely run into some of our

2   targets in and out of that house.

3   Q.  And one of those targets Mr. Spruell?

4   A.  Became Mr. Spruell down the road, yes.

5   Q.  And the pole camera that was set up to watch 233 --

6   2337 South 9th Street, that was set up by the ATF; correct?

7   A.  It was, yes.

8   Q.  And now that pole camera that was set up by the ATF, that

9   pole camera video, that was used by the marshals when they

10  tried to determine whether or not Mr. Spruell was located at

11  that address; is that correct?

12  A.  Right.  When he came out of the address, the individual

13  they believed was him, that was used to supplement and confirm

14  that, in fact, it was him, yes.

15  Q.  So U.S. Marshals watched the pole cam that had been set up

16  by the ATF?

17  A.  I'm not sure if the U.S. Marshals watched it or somebody

18  from ATF was watching it and relaying that information, but

19  somebody that day was watching it.

20  Q.  Okay.  I want to talk to you about the trash pull in

21  particular.  So there were two trash pulls conducted; correct?

22  A.  That's correct.

23  Q.  One on March 31st; correct?

24  A.  Correct.

25  Q.  And that trash pull was conducted by ATF Task Force Officer

1   Ryan Fincher?

2   A.  Correct.

3   Q.  And ATF Agent Temple?

4   A.  Correct.

5   Q.  And then the second one was on April 7th, 2022; correct?

6   A.  It was.

7   Q.  And that was conducted by ATF Agent Temple and yourself?

8   A.  That's also correct.

9   Q.  When these trash pulls were conducted, it was the ATF that

10  field tested as they were the agents that were there?  You

11  agree they were the one that field tested the baggies?

12  A.  That's correct, it would have been us.  It's a ATF test

13  kit.

14  Q.  And my understanding is the ATF was the one to process,

15  package it and enter it into evidence?

16  A.  If you're calling me ATF, myself and Detective Fincher

17  actually did most of the processing because we were taking the

18  evidence back to KCKPD.  So we were actually the ones that

19  entered it into evidence.  The agents wouldn't have been able

20  to do that.

21  Q.  And then the trash pulls -- the first trash pull from the

22  home on South 9th Street, ultimately there were only two torn

23  baggies that were tested; is that correct?

24  A.  Which date did you say, ma'am?  I think the second one,

25  that is -- the first one is I think we have 12 bags.

1    Q.  Right.  I think I want to be clear, it's my understanding

2    that although 12 bags were collected, two bags were tested?

3    A.  Correct.  We later sent bags to the KBI I believe with your

4    request that tested -- initially they were the two.

5    Q.  Okay.  But you think ultimately all of them were tested at

6    the KBI lab?

7    A.  They were.

8    Q.  Okay.  And then the second trash pull, there was just a

9    baggie and a pipe that were collected --

10   A.  Correct.

11   Q.  -- right?

12       And those were also tested?

13   A.  Yeah, the pipe was tested as well.  That's why you see that

14   little test kit over it and then the baggie.

15   Q.  Now, I want to talk about the trash pulls in conjunction

16   with the search warrant.  You mentioned the two trash pulls in

17   the search warrant, but at that point, when you're writing the

18   application for the search warrant, it doesn't state that any

19   particular person at that residence on South 9th Street was

20   using methamphetamine; correct?

21   A.  Yeah, I don't think I listed a person like Michael

22   Kindred's name or anybody's name.

23   Q.  Okay.  Also did not list anyone's particular name that was

24   distributing or selling methamphetamine from that residence?

25   A.  That's correct.

1    Q.  Nothing in the affidavit that admits that you had any

2    anonymous tips that drugs were being sold at the home?

3    A.  The only tip -- I wouldn't really call it a tip.  The only

4    information we got is from the witness who lived next door who

5    had described the activity observed outside of the house

6    indicative to the sales of narcotics.

7    Q.  But that individual was not named in the affidavit that you

8    drafted; correct?

9    A.  No, I wouldn't put that individual in the warrant, no.

10   Q.  And, in fact, I don't think there's any information about

11   the date that that individual was spoken to in the warrant;

12   correct?

13   A.  Yeah, the date would have been the day after the shooting

14   or the day after, but I wouldn't have -- I would have done the

15   best I could not to provide their name on anything if I didn't

16   have to for their safety.

17   Q.  Understood.  Or a date?

18   A.  Well, yeah, I can tell you when the date was.  It was,

19   like, the day after the shooting.

20   Q.  Okay.  I guess what I'm trying to figure out, there doesn't

21   seem to be a date in the affidavit --

22   A.  Oh, yeah --

23   Q.  -- in the search warrant?

24   A.  -- correct.  I think I referenced without a date, that's

25   correct.

1    Q.  You would have had no information about any controlled buys

2    being at that residence; correct?

3    A.  Correct.

4    Q.  And nothing in the affidavit that any particular person in

5    the residence was either using, storing, or selling

6    methamphetamine; correct?

7    A.  Correct.

8    Q.  Okay.  Now, ultimately I believe, in looking at the lab

9    report, and I can show you a copy and you can look at it with

10   me, but ultimately I believe the material in the plastic bags

11   was tested at KBI, and the result of that combination of 12

12   bags was .2 grams of methamphetamine.  Does that sound right?

13   A.  I would say you're right on that.

14   Q.  Now, you note in the affidavit as well that you were --

15   information about the -- I think you said the alleged shooting

16   of Michael Rojas; is that correct?

17   A.  Correct.

18   Q.  And that happened, I think the affidavit states, the date

19   of March 17th, 2022?

20   A.  Correct.

21   Q.  And so the search warrant that was secured and then done at

22   the residence on South 9th Street was April 11th, 2022, almost

23   a month later?

24   A.  Correct, almost a month.

25   Q.  At the time that you wrote the affidavit for the search

1    warrant, Mr. Rojas had been found; correct?

2        There was no indication that he had -- not found but you

3    had investigated a shooting on a particular day?

4    A.   Right, yeah, the warrant was issued.  So the case wasn't

5    complete, but it was moving down the completion trail.

6    Q.   Okay.  And I think your statement was that there was a

7    suspect -- that Mr. Spruell was suspected of being picked up at

8    that residence in conjunction with the alleged shooting, but

9    the alleged shooting did not occur at that residence; correct?

10   A.   Correct, the shooting was about two miles west.

11   Q.   Okay.  I want to talk a little bit about the search -- the

12   affidavit and search warrant a bit further.  Can you explain

13   the process that you took to secure the search warrant?

14       So it's my understanding that there originally was an

15   arrest warrant for Mr. Spruell?

16   A.   There was.

17   Q.   And then you left the scene to procure a search warrant?

18   A.   Correct.

19   Q.   Okay.  So when you left the scene, where did you go?

20   A.   KCKPD Violent Crimes Task Force because I have a desk

21   there.

22   Q.   And you drafted the affidavit?

23   A.   I did.

24   Q.   Did you also draft the warrant that was submitted with the

25   affidavit?

22-20027  USA v Austin Spruell-Ussery  8.29.23                    43

1   A.  No, like what we would call attachments is drafted by the

2   -- by the -- I assume the DA's Office.  Well, I draft it, but

3   they I think as far as, like, submitting it, it's all submitted

4   separately to a judge.

5   Q.  And so you had nothing to do with the process of submitting

6   it to the judge.  You just draft the affidavit?

7   A.  I used to.  COVID changed that.  I submit it to the

8   Assistant DA's Office.  There's a charging attorney, which is

9   what it was that day.  That charging attorney then puts it to

10  the duty judge I believe.  And if that duty judge can't be

11  found, then there's a process on who they pick, and then it

12  just goes to a judge.  And then I get an e-mail back with a

13  signed warrant.  I sign under perjury is how that works.

14  Q.  Okay.  But so you -- you don't have anything to do with the

15  process of whether or not -- how the affidavit and the warrant

16  gets to the judge?

17  A.  I have no -- I don't.  No, I don't.

18  Q.  When you conducted the search of 233 -- 2337 South 9th

19  Street, were you the one that physically conducted that search?

20  A.  I did.

21  Q.  Okay.  And did you take photographs at the time of that

22  search?

23  A.  I think I did.  I'm -- I'm almost positive I was the one

24  that took the photographs.  I don't remember, like -- but I

25  would say I would have been the one that did that.

1   Q.  Okay.  And did you have any body cam on you at the time of

2   your search?

3   A.  No.  No.

4   Q.  It's my understanding that the ATF was involved in the

5   search of the home on South 9th Street; is that correct?

6   A.  There were -- there were at least three agents with us.

7   Q.  And so you along with three other ATF agents were the ones

8   to kind of effectuate the search warrant and recover the items?

9   A.  Right.  KCK narcotics -- not narcotics.  KCK SWAT actually

10  went in and secured the residence because they were on scene

11  for the barricade.  And once it was secure, then it was turned

12  back over to myself.

13  Q.  And what room was the firearm found in?

14  A.  The -- I would call it the back room.  If you walked in

15  that residence, there was a living room.  There was one room to

16  the left.  Then there was a dining room just in front of the

17  living room.  Michael Kindred's room was next to that dining

18  room to the left, and then there was a far bedroom all the way

19  to the back of the residence.  I remember three bedrooms in the

20  house.  The firearm was in the back bedroom closet if that

21  makes sense.

22  Q.  Was that room locked or...

23  A.  I know Michael Kindred's room had a padlock on it.  I

24  don't -- I know that the back bedroom wasn't locked, just there

25  was a hasp on Michael Kindred's room.

1   Q.  Okay.  Now, first trash pull I think we agreed on
2   March 31st, 2022?
3   A.  Correct.
4   Q.  And you found plastic bags that I believe you state were
5   presumptively positive for some methamphetamine; correct?
6   A.  Correct.
7   Q.  Okay.  And I think in the affidavit for the search warrant
8   you refer to this as evidence of use or storage or sale of
9   narcotics?
10  A.  Yes.
11  Q.  Even though you had that information in evidence, you
12  didn't apply for a warrant on that day; correct?
13  A.  Correct.
14  Q.  The next trash pull was on April 7th.  And, again, I think
15  we've agreed you found -- this may have been -- maybe details
16  are wrong, but a plastic, torn bag and pipe on that one?
17  A.  That's correct.
18  Q.  And that tested positive for the presumption of
19  methamphetamine?
20  A.  It did.
21  Q.  And you didn't apply for a warrant on that?
22  A.  Did not.
23  Q.  And then in the affidavit you mentioned that Michael Rojas
24  and the kidnapping on March 17, 2022 -- 2022.  You obviously
25  had that information a month earlier.  With all that

1   information with the trash pulls and the kidnapping, you didn't

2   apply for a warrant even earlier date than let's say the trash

3   pull on April 7th?

4   A.   On South 9th Street, no.

5   Q.   Now, I think you said, when you went back to the station,

6   you had received information that Mr. Spruell had a firearm?

7   A.   Correct.

8   Q.   And so that's what turned I think you said, for lack of a

9   better word, the need for a body warrant into the need for the

10  search warrant?

11  A.   Correct.

12  Q.   All right.  Now, in the affidavit you do refer to

13  Mr. Spruell.  You note that in March of 2022 he had completed

14  federal supervised release from a firearm case in federal court

15  and therefore would be prohibited from possessing firearms; is

16  that correct?

17  A.   Correct.

18  Q.   So when you applied for the warrant, you had information or

19  you thought probable cause that may have indicated that

20  Mr. Spruell was violating a federal offense?

21  A.   Again, possibly.  FIP is FIP.  I wasn't -- I was going to

22  be transparent about it, at least put it in there for felon in

23  possession.

24  Q.   Do you still have the affidavit in front of you?

25  A.   I do.

1   Q.  Okay.

2          THE COURT:  Is this affidavit in evidence?  Did I miss

3   that?

4          MS. RAMSEY:  I'm sorry, I thought I --

5          THE COURT:  I've never seen the affidavit or the

6   warrant.

7          MS. MCFARLANE:  Your Honor, Government's Exhibit 1 was

8   admitted.  I don't -- I can give the court a copy.

9          THE COURT:  Okay.  Yeah, I -- if I've got it, and I'm

10  going to get it in the exhibits, but I haven't laid eyes on it

11  yet.  I -- don't change anything you're doing, I just wanted to

12  make clear -- I want to make sure you knew I wasn't looking at

13  it.  So I'm trying to keep up with you.

14         MS. RAMSEY:  Understood.  I think I may have another

15  copy.

16         THE COURT:  That would be great.

17         MS. RAMSEY:  If that would be easier to move forward,

18  Your Honor, I think this is going to be easier.  It's been

19  admitted government's exhibit as a copy for the court's

20  reference.

21         THE COURT:  Thank you so much.  And while I've got you

22  interrupted, let me just be clear, because I want to make sure

23  I'm following, the first trash pull I had notes from what I had

24  read before the hearing that that occurred on March 31st.  I

25  thought you said March 21st, and so I just wanted to make sure

1    whether I just misheard or if you want to clear that up.

2    BY MS. RAMSEY:

3    Q.  Sure.  My understanding is the first trash pull happened on

4    March 31st --

5    A.  Yes, ma'am.

6    Q.  -- 2022?

7           THE COURT:  Thank you very much.

8    BY MS. RAMSEY:

9    Q.  In looking at the -- we're going to deal with Government's

10   Exhibit No. 1, which is the affidavit for the search.  On the

11   third page that is the second to the last paragraph, the

12   affidavit said, "Based on the above information, I have cause

13   to believe that heroin is at the premises of 2337 South 9th

14   Street, Kansas City, Wyandotte County, Kansas."  Had you

15   recovered any heroin from --

16   A.  That's a typo.  It's not heroin.  That should have been

17   said methamphetamine.  I've seen that since prepping for this

18   court.  That's an error.  There's no evidence of heroin being

19   in the house.

20   Q.  The affidavit also, on that last page, requests

21   authorization for seizure of electronic surveillance equipment;

22   correct?

23   A.  Correct.

24   Q.  It also lists -- and I'm looking at the last page where you

25   would sign under foregoing penalty of perjury for the court's

1   direction.  It includes the list of items at least that you

2   were seeking authorization to search for in the home.  Would

3   you agree with that?

4   A.   I would.

5   Q.   And in none of those particular items listed there are you

6   asking for authorization to search specifically for cell

7   phones?

8   A.   Again, I saw that yesterday as well.  It's on the front of

9   the hard warrant but not in the affidavit, that's correct.

10  Q.   In the affidavit you indicate that at one point -- and I'm

11  looking at page 3, first paragraph at the top, that at one

12  point a male exited the address wearing a red hoodie, and law

13  enforcement spoke to the man who said Mr. Spruell ran back into

14  the residence house, stripped off his clothes and had the man

15  put them on and walk outside, and the man told law enforcement

16  Spruell was armed with a firearm.  Is that correct?

17  A.   Correct.

18  Q.   Okay.  You did not interview this person?

19  A.   I did not.

20  Q.   Okay.  So this was information provided to you by someone

21  else?

22  A.   Yeah, Special Agent Granger with the ATF.

23  Q.   Did you -- it doesn't appear to me that Special Agent

24  Granger or anything in the affidavit indicates that there was

25  anything done to assess the credibility or reliability of the

1   information from the individual.

2   A.  You know, I wasn't on scene so I couldn't -- I was writing

3   the warrant or sitting at the seat preparing for the warrant,

4   so I don't know what all was asked of him.  I know his name was

5   written down later in the report, but I don't know what was --

6   how the questioning went that day.

7   Q.  In looking at Government's Exhibit 11, I think you said you

8   believe that you took the photographs during the search

9   warrant.  So would this have been a photograph that you took?

10  A.  Yes.

11  Q.  Is this how you found the firearm?

12  A.  It was actually wrapped in that garment in the back of the

13  closet that was pulled out and then photographed is what it

14  looks like to me.  I don't think I would have been able to get

15  a photograph in the back corner of that closet.

16  Q.  Okay.  Were any photographs taken of the gun as the state

17  it was in?

18  A.  This is the closest one I would -- I would -- without

19  looking at all the photographs, I would say this was the

20  closest one.  It was a real tight closet all the way to the

21  back corner.

22  Q.  Okay.  So I guess what I'm trying to establish is that we

23  don't have a photograph as the gun may have been originally

24  wrapped in the shirt in the back of the closet?

25  A.  I would have to look at all the photos to see.  I can tell

1    this -- and I believe that's actually a bed that it's -- that's

2    the bed in that room pulled out and then shown in a better

3    photograph.  There might be another one in evidence that I just

4    don't remember seeing.

5    Q.  Okay.

6         MS. RAMSEY:  Your Honor, if we could have one moment

7    please?

8         THE COURT:  Of course.

9         MS. RAMSEY:  Your Honor, may I approach?

10        THE COURT:  You may.

11   BY MS. RAMSEY:

12   Q.  Detective Blackman, I'm showing you what's been marked as

13   Defendant's Exhibit 801.  Do you recognize Defendant's

14   Exhibit 801 as the search warrant and attached to that is the

15   inventory -- what I believe is the inventory sheet --

16   A.  Correct.

17   Q.  -- from that day?

18       I want to focus on the second page, which is the inventory

19   sheet.  Is this typical?

20   A.  Sometimes, yeah, as long as we leave something that is --

21   what was taken out of the house, that is typical.

22   Q.  Okay.  And I believe there's no -- two firearms.  There's

23   no serial numbers for those firearms?

24   A.  No.

25   Q.  Okay.  There's no cell phones' IMEs or indications of

1    serial numbers on those cell phones?

2    A.  No.

3           MS. RAMSEY:  Your Honor, I move to admit Defendant's

4    Exhibit 801.

5           THE COURT:  Any objection to 801?

6           MS. MCFARLANE:  No objection.

7           THE COURT:  It's received.

8           MS. RAMSEY:  Your Honor, I'm going to provide this

9    copy to the court if I may approach.

10          THE COURT:  Please.  Thank you for doing that.

11   BY MS. RAMSEY:

12   Q.  And you would agree Defendant's Exhibit 801, as far as

13   what's authorized, the search, it does include cell phones; is

14   that correct?

15   A.  It does on the -- the warrant 801.

16   Q.  Okay.  But not in the affidavit?

17   A.  Not on that last paragraph, correct.

18   Q.  The firearm, the Glock model that is of issue in this case,

19   you said you believe it's currently with ATF?

20   A.  It is.

21   Q.  Okay.  And the ATF, they perform the interstate nexus

22   examination on the gun; is that correct?

23   A.  They do.

24   Q.  You have identified the 2337 South 9th Street, the

25   residence that is at issue with the search in this case, as a

1  trap house; is that right?

2  A.  Correct.

3  Q.  I believe you said that people do sometimes stay at a trap

4  house, sometimes they can be homeless and sleep there --

5  A.  In general, yeah.

6  Q.  -- stay the night.

7     Okay.  Have you watched the pole cam video of the -- in

8  this case of 2337 South 9th Street?

9  A.  I watched a little bit of that.  When that was up, I wasn't

10  monitoring a lot of that.  I was working the shooting when it

11  first went up.  I've seen the arrest on the video, and I -- I

12  remember watching it here and there during the day while I was

13  typing.

14  Q.  Okay.  But you haven't looked through it, made any notes,

15  things of that --

16  A.  The report that was submitted in discovery, I read through

17  some of that.  That was drafted by an agent, not myself.

18          MS. RAMSEY:  May I have one moment, Your Honor?

19          THE COURT:  You may.

20          MS. RAMSEY:  I have no further questions.

21          THE COURT:  Is there redirect for the witness?

22          MS. MCFARLANE:  No redirect, Your Honor.

23          THE COURT:  All right.  You may step down, sir.

24          Does the government have additional evidence?

25          MS. MCFARLANE:  No additional evidence, Your Honor.

1    We would just ask that the exhibits that have been admitted, to

2    the extent they haven't already, be provided to the court.

3         THE COURT:  Yeah, I'd like to have copies of the

4    exhibits obviously.  Why don't you coordinate with the

5    prosecutor on that front and make sure that everybody agrees

6    with what's been admitted.

7         Ms. Ramsey, does the defendant wish to present

8    evidence on the pending motions?

9         MS. RAMSEY:  Your Honor, we do.  We would like to

10   announce to the court we would be calling Mr. Spruell.  I'll be

11   limiting my questions as such to establish standing.  We

12   believe that -- and just to give information to the court ahead

13   of time, we believe that he does have protections under *United*

14   *States versus Simmons* regarding any other statements outside

15   the scope of that, and so we will be directing our questions

16   only to that.

17        THE COURT:  Counsel, so tell me your -- it's a

18   relatively unusual event when the defendant testifies.  Nothing

19   wrong with it.  I just want to make sure we are operating from

20   the same premise here.  Does the government contend that any

21   sort of advisory or warning is in order to give to the

22   defendant before he takes the stand?

23        MS. MCFARLANE:  Your Honor, I, frankly, haven't had

24   this come up in this context before and I haven't read the case

25   that was referenced.  I didn't know until this minute he was

 1    planning on testifying, so I'm really not sure.  I would think

 2    that there should be something told to the defendant similar to

 3    a trial about his right not to testify and incriminate himself.

 4    So but anything more specific than that I just -- I'm not sure.

 5              THE COURT:  Ms. Ramsey, what's your view?

 6              MS. RAMSEY:  Your Honor, my view is that I think under

 7    *Simmons* the question is does he have a right to testify at a

 8    suppression hearing and then those statements later be used

 9    against him at a trial and should he be forced to make that

10    choice.  I think *Simmons* says no, and that is why, in fact, any

11    statements made during a motion to suppress cannot necessarily

12    be used against him during the process at trial.  So that's why

13    I wanted to announce to the court that I'm confining my

14    questions to standing -- the issue of standing.  And then I

15    think any other questions outside of that would not -- I don't

16    want to go beyond the scope of direct but would be relevant for

17    purposes of establishing that.

18              THE COURT:  And so your view is the court should not

19    advise him of his right or remind him of those rights?  I

20    haven't read *Simmons* because I didn't know this issue was

21    coming up either and I don't have the citation to the case.

22              MS. RAMSEY:  I can give you -- I brought copies for

23    the court.

24              THE COURT:  I think I'll take a recess and go read it.

25    Obviously his rights are important in the proceeding and I want

```
1    to make sure that I'm adequately prepared to have this

2    conversation with counsel.

3         MS. RAMSEY:  Thank you, Your Honor.  I don't -- I

4    think it would be helpful to have -- I will bring it to the

5    court in just a minute.  I don't know it will answer your

6    ultimate question, but I will provide it.

7         THE COURT:  Okay.  It's not going to hurt.

8         MS. RAMSEY:  No.

9         THE COURT:  All right.  Let's do this:  I'm going to

10   take -- I'm going to leave the bench for a few minutes while I

11   do this.  Let's take about 10 minutes, then I'll come back out

12   and see where we are.  But if you could be ready to come back

13   in the courtroom in ten minutes, I'll aim to be on that

14   schedule as well.  All right.  Thank you.

15       (Recess.)

16        THE COURT:  All right.  We're back on the record in

17   the presence of Mr. Spruell-Ussery and counsel.  And after a

18   short recess -- during a short recess, I should say, I examined

19   hurriedly the defendant's case authority, *Simmons against the*

20   *United States*, which is reported, among other places, at

21   390 U.S. 377.

22        Ms. Ramsey, here's what I'm inclined to do just from a

23   hurried examination of the case and some preliminary research

24   about the durability of the holding in the case, is I'm

25   inclined to pause the hearing and have a look at this issue so
```

1  that whatever happens next is consistent with informed input

2  from the parties about whether any sort of reminder to the

3  defendant about his rights is warranted or not.  Do you object

4  to that approach?

5          MS. RAMSEY:  You mean in continuing the hearing?

6          THE COURT:  I do.

7          MS. RAMSEY:  Yes.  No, I don't object to that.

8          THE COURT:  Does that concern you, Ms. McFarlane?

9          MS. MCFARLANE:  It doesn't, Your Honor.  Thank you.

10          THE COURT:  So -- and I take it the testimony you

11  envision, if the defendant does indeed decide finally I'm going

12  to testify, fairly concise, is it?

13          MS. RAMSEY:  Yes and limited.

14          THE COURT:  I thought it would be.  Do you anticipate

15  you'll have other evidence besides that possible testimony?

16          MS. RAMSEY:  I don't, Your Honor.

17          THE COURT:  So what I'm going to do is I'm going to

18  continue this out two Thursdays, because I want some time for

19  the parties to have an opportunity to look at the *Simmons* case,

20  to have a chance to speak to the court if they want to in

21  something written about whether intervening authority calls any

22  part of *Simmons* as -- the part of *Simmons* -- I know there were

23  three issues that the Supreme Court took up -- the relevant

24  issue, whether any part of that has been replaced or rearranged

25  by subsequent holdings by the court or whether some of it's --

1   I guess I would call it predicates or foundation have been

2   called into question by subsequent Supreme Court cases and to

3   think about what it means here in terms of what interaction,

4   what dialogue should take place with Mr. Spruell-Ussery, if

5   any.

6          So let me just have a moment to talk about what's

7   happening.  Two weeks from tomorrow actually is what I'm

8   looking at.  Well, I'm going to take a flier on this and hope

9   it works out.  So two weeks from today is Thursday,

10  September 14th, and I'm going to set the case at the end of the

11  afternoon docket that day.  Sorry to do that to you, but there

12  are two sentencings on that portion of the docket that I want

13  to make sure we get in.

14         I know the defendant will be here for that proceeding,

15  and given the view that I don't -- I don't anticipate the

16  government will have additional evidence.  I know you haven't

17  heard it.  I'm not asking for your commitment.  You'll be

18  granted some leave.  But just hearing how this has fallen in

19  place, I don't anticipate this will lead to kind of, you know,

20  you give a mouse a cookie sort of a problem.  So I think we'll

21  be able to wrap up our work that day.

22         But I do ask you, in the intervening period, if you

23  want to put something in in writing about what this case means

24  and does to inform the decision about whether the defendant

25  deserves or should be advised of his rights before he

1    testifies, I would appreciate reading your -- I don't mean to

2    confine anything you submit to just the *Simmons* case, although

3    obviously it's the focus of the argument right now.  But if you

4    believe there are other authorities that really inform the

5    decision, then I'd be grateful to hear about them from you in

6    advance and I will look at them in advance.  And then if you're

7    of the view that some sort of colloquy ought to take place with

8    the defendant before he gets in the witness chair, I'd like to

9    know what you think that ought to sound like.

10          I will look at this, of course, myself but I would ask

11   you to have any submissions you want to make in by a week from

12   Friday of this week, which I think means by the close of

13   business on September 12th so I could start within the

14   following week before -- I don't -- I think I got the dates all

15   mixed up.  I do.  So I'd like to have them from you by

16   September 8th, that's the Friday I meant to nominate, and then

17   I'll plan to see you on the 14th with the hearing to resume,

18   and we can discuss any legal questions before we return to the

19   evidentiary segment of the case.

20          Does that seem like a fair way to proceed,

21   Ms. McFarlane?

22          MS. MCFARLANE:  Yes, Your Honor.

23          MS. RAMSEY:  Yes, Your Honor.

24          THE COURT:  Ms. Ramsey?

25          Thank you.  I'll watch for your submissions and I'll

 1   get more acquainted with the *Simmons* authority.  Would you,

 2   please, make sure that the deputy clerk -- the courtroom deputy

 3   has all the exhibits that have been received -- been admitted

 4   so far that we'll have our record in good shape on that.

 5           With that approach, is there anything else we ought to

 6   talk about before we go separate ways today, Ms. McFarlane?

 7           MS. MCFARLANE:  Your Honor, would it be appropriate at

 8   this time for the court to make speedy trial findings just for

 9   this time frame from this hearing to the next?

10           THE COURT:  Yeah, I will tell you I think we are

11   covered on the speedy trial axis.  The motion that generated

12   this hearing -- those two motions actually remain open and are

13   not submitted yet for decision, so I don't think the 30-day

14   period for the court to make a determination of the motion has

15   started because we haven't concluded our evidentiary

16   proceedings.  That's the way I see it.  Do you see it

17   differently?

18           MS. MCFARLANE:  No, Your Honor, I agree.

19           THE COURT:  Ms. Ramsey, do you have concerns of a

20   speedy trial nature?

21           MS. RAMSEY:  No, Your Honor.

22           THE COURT:  All right.  I'll plan to see you on

23   September 14th.  And if there is a -- if I've committed a major

24   timing, scheduling mistake in Ms. Garrett's absence, we'll

25   figure that out and we'll be in touch, but I plan on seeing you

1    on the afternoon of the 14th and looking forward to whatever

2    submissions you can make between now and then.  Thanks very

3    much for your presentations today.  We'll be in recess for now.

4        (Proceedings adjourned.)

5

6

7                        CERTIFICATE

8        I certify that the foregoing is a true and correct

9    transcript from the stenographically reported proceedings in

10   the above-entitled matter.

11       DATE:  September 28, 2023

12
                        /s/Kimberly R. Greiner
13                      KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
                        United States Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25